Howard S. LEVIN, Plaintiff,

v.

INTERNATIONAL BUSINESS MA-
CHINES CORPORATION and Levin-
Townsend Computer Corporation, De-
fendants.

No. 70 Civ. 1654.

United States District Court,
S. D. New York.

June 29, 1970.

Goldstein, Gurfein, Shames & Hyde,
New York City, Greene & Orloff, New-
ark, N. J., for plaintiff.

Cravath, Swaine & Moore, New York
City, for defendant International Busi-
ness Machines Corp.

Simpson, Thacher & Bartlett, New
York City, for defendant Levin-Town-
send Computer Corp.

## OPINION

LASKER, District Judge.

Howard S. Levin ("Levin"), plaintiff
in this derivative stockholder suit, seeks

a preliminary injunction against defendant International Business Machines Corporation ("IBM"). Levin, still a substantial stockholder in defendant Levin-Townsend Computer Corporation ("L–T"), was its President until January 1970, when he was ousted. He is presently engaged in a proxy fight to regain control of the corporation. He commenced this derivative stockholder suit on behalf of L–T against IBM on April 23, 1970, alleging numerous violations of the antitrust laws.

IBM is a manufacturer of computers, which it leases or sells to customers. L–T is in the business of leasing computers and has been a leader in this industry, which has grown rapidly in recent years. It neither manufactures nor sells such machines, but purchases electronic data processing equipment from IBM and leases the equipment to its own customers at rentals lower than the lessee would pay on a direct lease from IBM. Over a period of years L–T has purchased from IBM approximately $150 million worth of such equipment. $90 million of the purchases have been made pursuant to installment credit agreements with IBM providing for monthly payments over a 48-month period. IBM maintains security interest in the equipment until full payment is made, and has the right to accelerate all amounts due and repossess the equipment at any time upon L–T's failure to make any monthly payments as due.[1] Neither Levin nor L–T contests or disputes the nature of IBM's security rights.

In the last year L–T has fallen in arrears in its payments to IBM. Currently it owes IBM over $11 million on its installment contracts (that is, these installments are past due) and $4 million on account of maintenance service and other miscellaneous matters. The delinquency on the installment payments gives IBM the undisputed right to make currently due the entire $45 million payable on the installment agreements. On June 17, 1970, IBM exercised its right to accelerate an initial portion of that amount.

The present motion seeks a preliminary injunction to prevent IBM from exercising its rights under the installment purchase agreements by notifying customers or lessees of L–T, by foreclosing on security interests, by accelerating amounts due, by repossessing the machinery sold by IBM to L–T, or by "taking any steps to collect or otherwise enforce the indebtedness allegedly due to it from" L–T. In his reply brief Levin requests that the injunction decree a stretch-out of payments due to IBM at a proposed rate of $1 million a month. He adds the suggestion that the court appoint a fiscal agent to supervise the pay out.

### I.

Levin contends that vast sums are owed to L–T by IBM because of the violations of the antitrust laws alleged in the complaint. On this motion he stresses certain violations which he claims consist of acts so clearly illegal that they are per se violations, thus assuring, as he sees it, the probability of his success in this action. He emphasizes in particular two alleged illegal tie-ins:

First, that IBM forces L–T and other leasing corporations to purchase certain "hardware features" and "memory core upgrades" rather than permitting such leasing companies (who are all purchasers of the basic equipment) to lease these items, although IBM *does* lease these items to its *own* rental customers. Levin says that, although L–T needs to furnish these features and memory upgrades to its customers, they are necessary only occasionally and for limited periods of time. Accordingly, Levin argues that in a free market L–T or anyone in its position would obviously rent such features and memory upgrades rather than purchase them, but that L–T has been compelled to purchase them by IBM, which has a monopoly of them and which refuses to rent them to equipment

---

1. Affidavit of Allen J. Krowe sworn to June 22, 1970, para. 5, Exhibit A.

leasing companies (even though, as indicated above, IBM will lease these items to its *own* rental customers). Levin alleges that the forced purchase of these items has cost L–T $17.5 million and that IBM's purpose in compelling these purchases (and otherwise oppressing L–T as set forth in the complaint) has been to drive L–T and other leasing companies out of business as competitors.

The second alleged tie-in complained of by Levin is the arrangement by which IBM until June 1969 sold "hardware" and "software" [2] as one package for a single price. Since June 1969, IBM has sold hardware and software separately, and Levin argues that this is an acknowledgment that its previous behavior was illegal. Levin contends that the cost of the software purchased by L–T from IBM prior to June 1969 was no less than "47,000,000 which when added to the $17,500,000 in damage suffered in the features and memory core tie-ins is grossly disproportionate to the $14,000,-000 which Levin-Townsend is in arrears."

Levin views the situation as one in which IBM, a giant of industry and a competitor of L–T as a lessor in the computer industry, is attempting to drive L–T out of business by methods which are in violation of the antitrust laws. He argues that it would be ironical and inequitable to allow IBM to exercise its acknowledged security rights to foreclose on L–T's equipment when it is IBM's course of conduct that has been the very cause of L–T's liquidity crisis and when IBM itself has brought on the situation against which Levin claims L–T is entitled to be protected. Levin asserts that IBM would not suffer if it were re-strained from exercising its foreclosure rights, since the value of the machinery on which IBM has a lien, together with L–T's other assets (to say nothing of the amounts claimed in this complaint), would more than amply secure repayment to IBM.[3]

Finally, Levin contends that failure to protect L–T against the exercise of IBM's foreclosure rights will cause the trustees of various Levin-Townsend indentured obligations to demand the sums due them, thereby effectively putting L–T out of business—and, according to Levin, this is precisely what IBM is trying to accomplish.

In reply, IBM asserts that no tie-ins were imposed by it on L–T. As to the question of requiring its purchasers of basic equipment to purchase (rather than lease) hardware features and memory core upgrades, it takes the position that such a requirement is a reasonable and technologically and economically justifiable policy. It views the matter as analogous to that of a mass automobile purchaser, such as, for example, the national car leasing companies, insisting on the right to lease (as distinguished from purchase) such accessories as radios or special engines. It states that not only is L–T not required by IBM to purchase any of these features at all, but that if L–T wishes to acquire any such features it is proper, reasonable and legal for IBM to require that the items be purchased and not leased. So far as the alleged "hardware-software tie-in" is concerned, it is IBM's position that Levin's argument is internally inconsistent. IBM asserts that Levin complains on the one hand that prior to June 1969 L–T

---

2. The industry term "hardware" applies to equipment and auxiliary mechanical features, the term "software" to such items as paper, cards and other materials used in connection with mechanical equipment.

3. Levin contends that the resale value of the $90 million of computer equipment on which IBM has a lien is 88 percent of its original cost, or $79,200,000. The papers on both sides appear to establish that in ordinary circumstances a computer of the age in question may be resold at approximately 88 percent of its original cost. Here, however, there is a question as to whether such a large number of machines will necessarily be sold at that level. These figures are to be contrasted with the total accelerated debt due from L–T to IBM in the amount of $45 million. There are, of course, other assets of L–T, but IBM has no secured rights in such assets. It should be noted also that there are other L–T creditors besides IBM.

was required to pay for and take things which it did not want (i. e., the software when it bought the hardware). On the other hand, says IBM, since June 1969 L–T has claimed that IBM was contractually obligated to supply the software, together with the hardware, at no increase in price. In any event, IBM contends, the contract by which IBM sold the machinery to L–T contains no provision obligating IBM to supply software, and its doing so prior to June 1969 was no tie-in and no violation of the Act.[4]

As to the allegation that IBM is trying to drive L–T out of business, IBM denies it and replies that there is no evidence before the court of such motivation, that that issue is before the court in the plenary suit and will be determined there, and that its action is motivated by and intended for the normal purpose of protecting its rights as a secured creditor by methods classically devised to attain that object. IBM vigorously challenges Levin's assertion that IBM's practices have caused L–T's financial difficulties and counters with persuasive evidence that L–T is responsible for its own problems, having embarked on business ventures outside of its normal field, such as the purchase of a Las Vegas gambling casino, investment in Broadway theatrical productions, and other ventures, all of which have failed, causing substantial losses in profits and cash to L–T.

As to Levin's argument that the exercise of IBM's foreclosure rights will cause the trustees of L–T's indentured obligations to proceed to collection, IBM replies that the trustees of those obligations are aware of L–T's much publicized financial situation and that there is no evidence before the court or otherwise of the trustees' threatening to take such action.[5]

In addition to the contentions set forth above which go to the probability of the success of plaintiff on the merits, IBM argues that no injunction should be granted because Levin has no standing to sue derivatively; that even if he has standing to sue, he does not "fairly and adequately represent the interests of the shareholders" within the meaning of Rule 23.1, F.R.Civ.P.; and that under the rule of Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), the antitrust claim asserted here cannot be raised defensively against IBM's contract right to foreclose.

The basis of IBM's contention that Levin has no standing to sue is two-fold. In the middle of May, L–T itself instituted suit against IBM in the New York State Supreme Court, New York County, alleging substantially the same causes of action as in the instant suit. L–T secured a temporary restraining order such as sought here, and applied for a preliminary injunction. Prior to a ruling on the application for preliminary injunction, L–T withdrew its application for the in-

---

4. Levin has pointed out that there is presently pending in this District a civil suit brought by the United States to enjoin IBM from selling on a hardware-software tie-in basis, and that a number of antitrust suits by customers of IBM have been brought on the same grounds and are pending on a consolidated basis in the United States District Court for the District of Minnesota. While the pendency of these cases, particularly the case brought by the Government, may constitute some evidence that the hardware-software practice was a tie-in in violation of the law, nevertheless such evidence would be of limited value since no adjudication has been made in any of the cases. Furthermore, on this motion for a preliminary injunction in which time is of the essence to the parties, it has been obviously impossible for the court to examine the files of those cases in order to determine their relevance and the weight, if any, of the evidence which Levin asserts they constitute in this case.

5. IBM's position in this matter appears to be supported, at least in part, by the somewhat tentative expression on this point in Levin's Memorandum in Support of this Motion, p. 4, to the effect that: "Levin-Townsend has outstanding a number of computers for approximately $65,000,000 which *possibly* would be accelerable at the instance of the Trustees if IBM is permitted to proceed with its threat to seize computers in the hands of lessees. * * *" (Emphasis added.)

junction and counsel for the parties entered into a stipulation which provided that L–T's motion was "withdrawn with prejudice to plaintiff to seek, or to support any other person seeking, in this or any other proceeding whatsoever the same or substantially similar relief as that sought in the pending motion for preliminary injunction." (Appendix N, Affidavit of Thomas D. Barr, sworn to June 22, 1970).[6] On the face of the stipulation L–T has of course waived its rights to apply for a preliminary injunction in any court, and IBM argues that Levin cannot sue derivatively on rights which L–T has given up. Beyond that, IBM contends that, under the authority of Swanson v. Traer, 354 U.S. 114, 77 S.Ct. 1116, 1 L.Ed.2d 1221, on remand, dismissal affirmed 249 F.2d 854 (7th Cir. 1957), and other cases cited in its brief, except under unusual circumstances establishing that a corporation's refusal to sue is wrongful, or that the corporation is unable to institute suit, a stockholder cannot sue derivatively in place of the corporation; that Levin's complaint does not allege such circumstances; that accordingly the management of L–T has the right to determine, in the exercise of its best judgment, whether or not to bring suit against IBM and that by its answer in this case, filed May 12, 1970, L–T asserted that "in the best business judgment of said management this action should not be brought, at this time." (L–T Answer herein, para. 4).

As to the question of whether Levin fairly and adequately represents the interests of the shareholders within the meaning of Rule 23.1, F.R.Civ.P., IBM points out that Levin was ousted as President by the Directors of L–T because of their concern that he had wasted the corporation's assets; that he is being sued by some stockholders of L–T on behalf of all on the ground, among others, that he "operated Levin-Townsend as a vehicle for the satisfaction of his personal, private ambitions and fantasies," (Affidavit of Thomas D. Barr, para. 6), and that under Eisen v. Carlisle and Jacquelin, 391 F.2d 555, 562 (2d Cir. 1968), "as a result of the sweeping changes in Rule 23, a court must now carefully scrutinize the adequacy of representation in all class actions."

Finally, IBM argues that the ruling of Kelly v. Kosuga, supra, is applicable here and that under the ruling an antitrust claim cannot be asserted defensively to a contract right since, as the court stated in *Kelly*:

> "Past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, 'of preventing people from getting other people's property for nothing when they purport to be buying it.'" (supra, 358 U.S. at 520–521, 79 S.Ct. at 432).

---

6. Levin attacks the validity of the stipulation, which he claims to be unauthorized by L–T's Board of Directors. Against this, however, are the facts that the attorneys who represent L–T and signed the stipulation in its behalf are among the leading law firms of this city, and that simultaneously with the execution of the stipulation there was executed by counsel for both L–T and IBM a memorandum by which IBM agreed to forbear from exercising any of its rights as collateral security holder until June 1, 1970. IBM has abided by the memorandum agreement. On the face of it, therefore, it appears that there was good consideration for L–T's executing the stipulation. L–T's attorneys appeared in court both at the argument on the application for the temporary restraining order and on this motion. In neither instance, however, did they participate, but rather (on the first occasion) indicated that L–T took no position on the application for a temporary restraining order or for a preliminary injunction. At the argument on this motion, counsel for IBM orally represented that counsel for L–T had advised him that a majority of the members of L–T's Board of Directors had authorized execution of the stipulation. All that can be said at this time is that, while the validity of the stipulation is not free from doubt, in the present state of the record it does not appear that Levin will probably upset the validity of the stipulation.

**56**

## II.

After extensive argument before me on both the motion for a temporary restraining order and the motion for a preliminary injunction, and a careful reading of the voluminous material and able briefs submitted by the parties, I conclude that a preliminary injunction should not be granted under the circumstances of this case.

As prerequisites to the granting of a preliminary injunction, the court must find that the plaintiff will probably succeed on the merits of the case, and that without injunctive relief he will be irreparably damaged. Studebaker Corp. v. Gittlin, 360 F.2d 692 (2d Cir. 1966); Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840 (2d Cir. 1967). I find that plaintiff has not established that he will probably succeed on the merits of this case, nor that he or L–T will necessarily be irreparably damaged by the failure to secure an injunction. To be sure, IBM's exercise of its right to foreclose will damage L–T in the philosophical sense and perhaps financially, but such damage will in my opinion have occurred as the last act of L–T's, and not IBM's course of conduct. In my view it would be an improper exercise of the court's equitable powers to issue an injunction preventing a creditor from exercising his undisputed rights to foreclose except upon the strongest showing that the plaintiff will probably succeed in his case. Such a showing has not been made here. Furthermore, I believe that the damage which IBM would suffer if enjoined outweighs any claim to protection of L–T asserted by Levin, and that the form of relief requested by Levin is inappropriate.

In concluding that plaintiff has not demonstrated the probability of his success on the merits of this case, I have in mind the many obstacles to such success which the plaintiff must overcome in order to prevail. Although I am, of course, not ruling on the question, I find that substantial and serious questions are raised as to whether Levin has standing to sue and can qualify as fairly and adequately representing the stockholders of L–T within the meaning of Rule 23.1, F.R.Civ.P. I believe, also, that the doctrine of Kelly v. Kosuga, supra, may apply to the instant case and act as a bar to Levin's asserting his antitrust claims defensively against IBM's contract rights.

It is true that exceptions have been carved from the *Kelly* rationale. Levin relies on such a case, Associated Press v. Taft-Ingalls Corp., 340 F.2d 753 (6th Cir. 1965), cert. denied 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965), in which a divided court allowed an antitrust claim to be defensively asserted by holding that the facts before it constituted a case "where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act," within the meaning of *Kelly*. But putting aside the question of whether the decision correctly construed *Kelly*, *Associated Press* dealt with a situation in which the contract between the parties remained substantially to be executed. Here the contract has been fully executed, and it would appear that the result of enjoining IBM would be to undo the policy enunciated by Mr. Justice Holmes, and cited with approval in *Kelly*, "of preventing people from getting other people's property for nothing when they purport to be buying it." Certainly, in the circumstances, plaintiff has not established that he will probably overcome the *Kelly* bar.

Nor has plaintiff shown the probability of surmounting the serious obstacles to his success on the merits of the plenary action itself. At the very least, there are important questions as to whether IBM's refusal to lease, as opposed to sell, features and memory core upgrades to L–T constitutes a tie-in. Even assuming that it is true that L–T's customers need such items and that L–T can secure them only through IBM, the factual context here differs materially from the classic tie-in in which a seller refuses to sell an item to a buyer unless the buyer will buy a second item. Here

IBM does not sell its computers on condition that L–T purchase features and memory core upgrades. It is L–T which chooses to buy the computers and thereafter chooses to acquire the additional equipment. One may accept, arguendo, Levin's rationale that, however the facts are described, IBM's practice is coercive, but plaintiff cites no cases in which a court has held that such an arrangement violates the antitrust laws and he has not established the probability of his prevailing on this cause of action.

As to the alleged hardware-software tie-in, whether, as plaintiff's brief asserts (pp. 24–25), the pre-June 1969 arrangement was actionable because the hardware-software constituted one package or, as defendant IBM construes plaintiff's claim, that IBM had previously contracted to furnish software at no cost (IBM Memorandum, pp. 32ff), the plaintiff faces formidable problems.

As I understand it, before June 1969 IBM did furnish the hardware and software for one price; but, although on this motion the court is not called on to rule on the merits of the practice (the legality of which is pending before other courts in other actions), I find that there may have been sound business and engineering reasons for selling these complementary items together sufficient to raise doubts that the plaintiff will probably prevail on this cause of action.

As to plaintiff's claim (referred to in defendants' brief at pages 32ff and specified in various paragraphs of the complaint, particularly paragraphs 30 to 32) that IBM falsely represented and promised to L–T and the leasing industry that software would be furnished without additional charge, the contract between the parties (Exhibit G to Affidavit of Allen J. Krowe), at least on its face, does not support the contention, and no other probative or persuasive evidence is before me on this point.

In any event, even if it may be argued that, as to one or more of the matters discussed above, plaintiff has established a probability of success, nevertheless, analyzing in their totality the impediments to plaintiff's case, I find that he has not made the requisite showing that he will probably succeed on the merits of this case.

■ Finally, I decline to exercise the injunctive power of the court because I believe that the relief requested here is inappropriate. It seems to me that the court on this motion is being asked to approve what amounts to the equivalent of an "arrangement" or a "corporate reorganization" such as are provided for under the Bankruptcy Act. The plaintiff asks the court (in addition to enjoining IBM from exercising its foreclosure rights) to impose on IBM a stretch-out of the payments to be received from L–T and, if necessary, to appoint a fiscal agent to supervise the debtor's obligations. I believe that such relief, if it is to be granted, must be provided under the Bankruptcy Act, which Congress enacted for this very purpose, and that it would be wholly inappropriate for me to grant such relief on a motion for preliminary injunction. My opinion in this regard is fortified by the fact that to order L–T to pay a specific amount per month to IBM and to appoint a fiscal agent would not only affect IBM's rights inequitably, but could clearly affect other creditors of L–T who are not before the court and whose rights, therefore, ought not, and cannot, be adjudicated on this motion. It would be a futility to enact the scheme requested by plaintiff, since in my view it would be vulnerable to attack at least on the part of L–T's creditors other than IBM.

For these reasons the motion for a preliminary injunction is denied.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this opinion constitutes the court's findings of fact and conclusions of law.