Julius **MULLINS** et al.

v.

**KAISER STEEL CORPORATION,**
Appellant.

No. 79–1463.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 18, 1979.

Decided Sept. 17, 1980.

Rehearing Denied Nov. 12, 1980.

Certiorari Granted May 4, 1981.
See 101 S.Ct. 2044.

---

A. Douglas Melamed, Washington, D. C., with whom Robert A. Hammond, III and John H. Harwood, II, Washington, D. C., were on the brief, for appellant.

Stephen J. Pollak, Washington, D. C., with whom Ralph J. Moore, Jr., Wendy S. White, E. Calvin Golumbic and Walter P. O'Connell, Washington, D. C., were on the brief, for appellees.

Before WILKEY and MIKVA, Circuit Judges, and FLANNERY *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge MIKVA.

Dissenting opinion filed by Circuit Judge WILKEY.

MIKVA, Circuit Judge:

This suit was brought against Kaiser Steel Corporation (Kaiser) by the Trustees of the United Mine Workers of America Health and Retirement Funds, seeking payment of contributions due to these funds under the terms of the National Bituminous Coal Wage Agreement of 1974 (1974 Agreement). Kaiser's principal defense was that the contract provision sued on was illegal under both the antitrust prohibitions of the Sherman Act, §§ 1–2, 15 U.S.C. §§ 1–2 (1976), and the "hot cargo" proscriptions of the National Labor Relations Act (NLRA), § 8(e), 29 U.S.C. § 158(e) (1976). Rejecting these defenses, the district court granted summary judgment to the Trustees and awarded them attorneys' fees.[1] For the reasons set forth below, we affirm.

## I. THE PURCHASE-OF-COAL CLAUSE

The 1974 Agreement was a collective bargaining agreement between the United Mine Workers of America (UMW) and various coal operators and associations of coal operators, most notably the Bituminous Coal Operators Association (BCOA). As a member of BCOA, Kaiser became an employer–signatory to the 1974 Agreement.

Among the customary provisions of a collective bargaining agreement setting the terms and conditions of employment, the 1974 Agreement defined the obligations of the parties with respect to the management and funding of various health and retirement trusts established for the benefit of miners. Of particular importance to this litigation is Article XX(d) which provided three ways to measure the employer's obligation to contribute to these funds: first, by the amount of coal produced by the employer for sale or use; second, by the number of hours worked by the employees; and, third, by the amount of coal "procured or acquired" for sale or use for which no contribution had been made. In effect, this third provision—the so-called "purchase–of–coal clause"—required a signatory employer to contribute to the health and retirement funds for each ton of coal purchased from other producers who were not themselves parties to the 1974 Agreement and, hence, did not have a collective bargaining agreement with the UMW. It is the purchase–of–coal clause under which the Trustees now seek payment, and it is the purchase–of–coal clause that Kaiser claims should not be enforced on grounds of illegality.

Previous collective bargaining agreements between the UMW and BCOA had contained a similar provision, except that the predecessor clause required a contribution for coal bought from non–union producers that was double the required contribution for coal that UMW workers had mined. Due to this feature, the earlier

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. The district court's opinion is reported at 466 F.Supp. 911 (D.D.C.1979).

clause had been called a "penalty clause" and was the subject of considerable litigation; sometimes the legality of the clause was sustained, but sometimes it was not. *Compare United Mine Workers (Dixie Mining Co.),* 188 N.L.R.B. 753 (1971) (upholding clause) *with Riverton Coal Co. v. United Mine Workers,* 453 F.2d 1035 (6th Cir.), *cert. denied,* 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972) (invalidating clause). *See generally International Union, UMW v. NLRB,* 468 F.2d 1139 (D.C.Cir.1972). Under the current purchase–of–coal clause, the rates of contribution for the coal produced by union and non–union miners are equivalent. Whatever penalty may have been implicit in the disparity of payments in the earlier clause, that particular defect has been eliminated.

The terms of the 1974 Agreement clearly indicate that the parties were concerned about the legality of the purchase–of–coal clause and about having their bargained–for agreement undone by subsequent legal rulings on that point. Article XX(d)(1), which sets forth the rates of contribution, also provides that the UMW shall have the right to require the parties to meet and negotiate in good faith a replacement for the purchase–of–coal clause if the clause is adjudged to be invalid or unlawful. A similar provision is repeated in the article on severability, which requires renegotiation if the parties are prevented by legal authorities from "implementing or effectuating the economic benefits, including health and retirement fund payments, required by this Agreement." 1974 Agreement, Art. XXIX(b). Both these provisions are set forth in the margin.[2]

In addition to establishing the rates of contribution for the health and retirement funds, the 1974 Agreement required the employers to file monthly reports with the Trustees, setting forth the amount of coal

---

**2.** Article XX(d)(1) of the 1974 Agreement reads as follows, except that the specified rates of contribution have been eliminated:

During the life of this Agreement, for the periods of time indicated below, each signatory Employer engaged in the production of coal shall contribute to the Trusts established in this Article the amounts specified below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal produced by such Employer for use or for sale, and, in addition, each signatory Employer (including those engaged in the production of coal and those not engaged in the production of coal) shall contribute to the Trusts established in this Article the amounts specified below based on cents per hour worked by each of the Employer's Employees who perform classified work under this Agreement.

. . . . .

In addition to the contributions indicated above, during the life of the Agreement, each signatory Employer shall, for the periods of time indicated below, contribute to the Trusts established in this Article in the amounts shown below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by such Employer for use or for sale on which contributions to the appropriate Trusts as provided for in this Article have not been made (amounts shown below include cents per hour worked contributions converted to tonnage equivalents):

. . . . .

The parties hereto mutually agree that, if at any time during the term of this Agreement a court or tribunal of competent jurisdiction determines by a final decision that is not appealable that the provision appearing in the paragraph just preceding is invalid or in violation of the National Labor Relations Act, 1947, as amended, or other Federal or state law, the parties shall, at the option of and upon demand by the Union without affecting the integrity of any other provision of this Section or any other provision of the National Bituminous Coal Wage Agreement, meet and engage in good faith negotiations to agree upon a clause to be inserted into this Agreement in replacement of the provision found invalid or unlawful.

Article XXIX(b) of the 1974 Agreement reads as follows:

In the event the parties are restrained or prohibited by any agency or branch of the federal or state government from implementing or effectuating the economic benefits, including health and retirement fund payments, required by this Agreement, either party hereto may, after the imposition of such restraint, give sixty days notice of termination of this Agreement and, thereafter shall meet and discuss and attempt to agree on the basis for a continuation of the Agreement for its term. If no agreement is reached within the 60–day period, the Agreement will terminate.

produced internally and also the tonnage purchased elsewhere. 1974 Agreement, Art. XX(d)(5). An employer's failure to comply with the reporting requirement was stated in the contract to be an independent contract violation. 1974 Agreement, Art. XX(d)(7).

While the 1974 Agreement was in effect, Kaiser regularly reported and made contributions for coal it had produced; for purchased coal, it did neither. In April, 1978, four months after the 1974 Agreement expired under its terms, the Trustees brought this suit. They alleged that Kaiser had made coal purchases for which contributions were required under the purchase–of–coal clause, a fact Kaiser does not dispute.[3] On that basis, the Trustees sought compliance with the purchase–of–coal clause and payment to the funds accordingly.

The Trustees filed a motion for summary judgment, which was granted by the district court. Kaiser's cross–motion, grounded on several affirmative defenses, was denied. Kaiser has brought the matter here.[4]

**3.** There is a dispute as to when the Trustees first found out about Kaiser's outside purchases. Kaiser insists that the Trustees knew all along about such purchases but declined to bring suit until the Agreement had expired. The Trustees reply that they discovered the problem only in late 1977, when the Agreement was at or near completion. Because this is an appeal from summary judgment, we must assume that Kaiser's version of this disputed fact is correct. We note, however, that the relevance of that fact to the legal issues on appeal is marginal.

**4.** In the district court, Kaiser offered affirmative defenses other than its claims of illegality. These other defenses were summarily denied, and Kaiser has not raised them on this appeal.

**5.** There is, in fact, good reason to think that the purchase–of–coal clause is consistent with both federal antitrust and federal labor law. Because there is a "strong labor policy favoring the association of employees to eliminate competition over wages and working conditions," courts will sometimes tolerate that "lessening of business competition" which necessarily results from a union's success in standardizing workers' pay. *Connell Construction Co. v. Plumbers Local 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1976). In *American Federation of Musicians v. Carroll*, 391

## II. KAISER'S ILLEGALITY DEFENSE

The gist of Kaiser's defense to this suit is that the pertinent contract clause is unenforceable. The argument has two branches: first, that the purchase–of–coal provision was, in reality, an anticompetitive penalty, violative of sections 1 and 2 of the Sherman Act; and, second, that the purchase–of–coal provision violated section 8(e) of the NLRA–the so–called "hot–cargo" provision of the labor law, which precludes unions from bargaining for secondary boycotts of non–union goods. For either or both of these reasons, it is argued, the offending contract clause ought not be enforced.

■ In an appeal from a summary judgment, Kaiser is, of course, entitled to have its version of the facts presumed. *Bishop v. Wood*, 426 U.S. 341, 347, 96 S.Ct. 2074, 2078, 48 L.Ed.2d 684 (1976). It is not similarly entitled to have its legal characterization of the disputed contract clause prevail. This is not a case in which a contract's illegality is manifest.[5] *See generally* 14 Williston on

U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), for example, the Supreme Court upheld against an antitrust challenge a union regulation requiring all orchestra leaders to charge their customers the same minimum rates, a rule which lessened wage competition among the musicians whom the orchestra leaders hired. Over the years, courts have drawn under the ambit of the labor exemption to the antitrust laws union protective devices having much greater anticompetitive effects than the purchase–of–coal clause here under review. *See Granddad Bread, Inc. v. Continental Baking Co.*, 612 F.2d 1105 (9th Cir. 1979); *California Dump Truck Owners Ass'n v. Associated General Contractors*, 562 F.2d 607 (9th Cir. 1977); *Iodice v. Calabrese*, 512 F.2d 383 (2d Cir. 1975); *Intercontinental Container Transport Corp. v. New York Shipping Ass'n*, 426 F.2d 884 (2d Cir. 1970). In fact, one district court has already held that the purchase–of–coal clause itself does not violate the Sherman Act. *United States Steel Corp. v. International Union, UMW*, C.A. No. 75–1966 (D.D.C. Oct. 5, 1977).

Comparable considerations apply to the alleged "hot cargo" violation. The Supreme Court has cautioned against reading the NLRA's prohibitions against secondary boycott activities by unions in a way that would preclude pressuring employers to improve their employees' wages, hours, and working condi-

Contracts § 1630B (3d ed. 1972) (indicating procedural implications of whether or not contract is manifestly illegal). The narrow issue on appeal, therefore, is not whether an illegal contract clause should be enforced but rather whether Kaiser's proffered defense of illegality should be entertained. By granting summary judgment for the Trustees, notwithstanding Kaiser's claim that the clause was in two ways illegal, the district court decided that Kaiser was not entitled to interpose the illegality defense. This, we now hold, is correct.[6]

In holding as we do today, we join two other courts of appeals on this question. In *Huge v. Long's Hauling Co.*, 590 F.2d 457 (3d Cir. 1978), *cert. denied*, 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979), the Third Circuit decided a case exactly like the one here on appeal: a suit under the 1974 Agreement by welfare fund trustees to enforce the purchase–of–coal clause met by the defense of illegality under the Sherman Act and section 8(e). The *Huge* court held that neither defense could be interposed. More recently, the Ninth Circuit, in *Waggoner v. R. McGray, Inc.*, 607 F.2d 1229 (9th Cir. 1979), considered whether a suit by the trustees of a benefit fund should be dismissed on the ground that the provision sued on violated section 8(e) and was, thus, unenforceable. The court held that because the defendants had not first presented their unfair labor practice allegations to the Labor Board, the district court should have decided the trustees' contract claim without

---

tions. *National Woodwork Manufacturing Ass'n v. NLRB*, 386 U.S. 612, 643, 87 S.Ct. 1250, 1267, 18 L.Ed.2d 357 (1967). It can no longer be doubted that a union does not run afoul of section 8(e) merely by insisting on a "union standards" clause, that is, one which prohibits an employer from subcontracting work to other employers whose economic benefits and working standards are not commensurate with those of the union's collective bargaining agreement. *E. g., Teamsters Local 216 v. NLRB (Bigge–Drayage)*, 520 F.2d 172, 177–78 (D.C.Cir.1975); *Local 433, Carpenters v. NLRB*, 509 F.2d 447, 452–53 (D.C.Cir.1974); *Truck Drivers 413 v. NLRB*, 334 F.2d 539, 548 (D.C.Cir.), *cert. denied*, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); *Orange Belt Dist. Council of Painters v. NLRB*, 328 F.2d 534, 537–39 (D.C.Cir.1964). Even a clause that, by economic disincentives, serves to dissuade an employer from subcontracting below "union standards" does not necessarily violate section 8(e). *George Ryan Co. v. NLRB*, 609 F.2d 1249, 1254 (7th Cir. 1979). It may well be that the provision Kaiser challenges here is a kind of "union standards" clause and, hence, lawful under section 8(e). In fact, another employer signatory of the 1974 Agreement has previously charged that the purchase–of–coal clause violates section 8(e), but the Board's General Counsel refused to issue a complaint. *International Union, UMW (Consolidated Coal Co.)*, NLRB Case No. 6–CE–17 (March 28, 1979). The implication of this action is that the General Counsel did not regard the claim as "sufficiently meritorious to warrant Board consideration." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 139, 95 S.Ct. 1504, 1511, 44 L.Ed.2d 29 (1975). In any event, the issue of the legality of the clause cannot be addressed finally in this lawsuit.

6. The dissent contends that a court confronted with the *allegation* of contract illegality can enforce the disputed clause only in two cases: (1) if it concludes that the clause is legal notwithstanding the allegation to the contrary or (2) if it assumes (or concludes) that the clause is illegal but enforceable nevertheless. Dissenting Opinion 642 F.2d at 1321–1322. We do not believe, however, that this exhausts the possibilities. As a third alternative, the court can simply refuse to entertain the illegality defense. *See Viacom Int'l, Inc. v. Tandem Prods. Inc.*, 526 F.2d 593, 600 (2d Cir. 1975) (sustaining district judge's "refusal to consider [defendant's] proffered antitrust defense"). Accordingly, we here decide neither that the purchase–of–coal clause was legal nor that it is enforceable notwithstanding its illegality but only that the district court properly declined to entertain the defense.

The dissent also contends that the illegality of the disputed clause must be assumed because this is an appeal from a summary judgment. Dissenting Opinion 642 F.2d at 1322–1323, 1331. This, however, confuses allegations of fact with legal conclusions drawn from those facts. *See generally* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1368, at 692–93 (1969). Neither case law nor analysis supports the proposition that on appeal from summary judgment, the court must accept as correct the losing party's assertions as to the legality of a disputed contract clause. Moreover, it is not accurate to say–as our dissenting colleague does–that judgment for the Trustees in this case would "enforce a contract clause which *plainly* violates the law." Dissenting Opinion 642 F.2d at 1320 (emphasis added). For even if all of Kaiser's factual allegations are true, the purported illegality of the disputed clause is far from clear. *See* note 5 *supra*.

reference to the section 8(e) defense. 607 F.2d at 1236.

## A. Antitrust Illegality

It has never been easy to reconcile the strong command of the antitrust law to fight monopolistic practices with the necessity to preclude windfalls and unjust enrichment of parties to a contract. When confronted in 1909 with a price–fixing scheme "more certain in results, more widespread in its operation, and more evil in its purposes" than any other with which it might be compared, *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 256, 29 S.Ct. 280, 290, 53 L.Ed. 486 (1909) (quoting circuit court opinion, 148 F. 939, 947 (6th Cir. 1906)), it was easier for the Supreme Court to permit an antitrust defense to the plaintiff's contract action than it was to reconcile that result with any other case—before or since. *Compare Continental Wall Paper Co. v. Louis Voight & Sons Co.,* supra, (allowing defense) *with Connolly v. Union Sewer Pipe Co.,* 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 (1902) (disallowing defense) *and D. R. Wilder Mfg. Co. v. Corn Products Refining Co.,* 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520 (1915) (same) *and A. B. Small Co. v. Lamborn & Co.,* 267 U.S. 248, 45 S.Ct. 300, 69 L.Ed. 597 (1925) (same). Various "tests" were articulated to achieve the reconciliation needed to square antitrust law with basic contract principles. Contracts "collateral" to the unlawful combination could be enforced, but "inherently illegal" agreements could not. *See A. B. Small Co. v. Lamborn & Co.,* 267 U.S. at 252, 45 S.Ct. at 302; *D. R. Wilder Mfg. Co. v. Corn Products Refining Co.,* 236 U.S. at 172–78, 35 S.Ct. at 400. The test was as useless as it sounds. In 1959, the Court undertook to give the question a thoroughgoing review.

In *Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), a seller brought suit on a contract for sale of 50 carloads of onions at market price to an onion grower. The contract was part of a larger scheme: the seller–plaintiff, who owned large quantities of onions, would not sell them on the futures market if the defendant and other onion growers would each buy a portion of the seller's stock and similarly withhold them from the market. The effect and intent of the scheme, it was alleged, was to inflate the market price of onions. After taking some deliveries and making some payments, the defendant backed out of the deal, and the seller sued.

The Supreme Court ruled that onions delivered or ready to be delivered had to be paid for by the defendant, notwithstanding his claim that the contract under which the onions were purchased was part of a larger price–fixing scheme which the Sherman Act would deem foul. The Court acknowledged the previous difficulties with the problem, stating:

> As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court. This has been notably the case where the plea has been made by a purchaser in an action to recover from him the agreed price of goods sold.

358 U.S. at 518, 79 S.Ct. at 431 (footnote omitted). The Court, noting its extreme reluctance to supplement the express remedies provided by the antitrust laws with an additional remedy of contract avoidance, *id.* at 519, 79 S.Ct. at 431, restated the narrow limits within which the defense of antitrust illegality would be allowed:

> Past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the [Sherman] Act, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, "of preventing people from getting other people's property for nothing when they purport to be buying it." . . . Supplying a sanction for the violation of the Act, not in terms provided and capricious in its operation . . . is avoided by treating the defense as so confined.

358 U.S. at 520–21, 79 S.Ct. at 432 (quoting from Justice Holmes' dissent in *Continental Wall Paper Co. v. Louis Voight & Sons Co.,* supra, 212 U.S. at 271, 29 S.Ct. at 296)

(citations omitted). The pith of *Kelly* is that the illegality of the ends being sought is not the measuring stick for deciding whether the contract should be enforced; only if the enforcement "would be to make the courts a party to the carrying out of one of the very restraints forbidden by the Sherman Act," can a court refuse to enforce the contract. 358 U.S. at 520, 79 S.Ct. at 432.

The difficulty *Kaiser* has in trying to fit into the tiny exception left by *Kelly* is obvious: how can the court be a party to an anticompetitive scheme simply by enforcing a contract which requires employers to make payments into a union's health and retirement funds? If the clause has any purpose other than that, it is, argue the Trustees, only to preserve the work and work standards of UMW workers by counteracting wage competition among coal producers. Despite its anticompetitive effects on the product market, such a purpose is permitted under federal law. *Connell Construction Co. v. Plumbers Local 100*, 421 U.S. 616, 621–22, 95 S.Ct. 1830, 1834, 44 L.Ed.2d 418 (1976). *See generally* note 5, *supra.*

Kaiser's response is to characterize the clause as a penalty designed to enforce a boycott against those who have not signed collective bargaining agreements with the UMW. The clause operates, Kaiser argues, as an economic sanction that induces signatory employers to buy coal only from other signatory employers, and no one else. To persuade the court of this, Kaiser details some of the tortuous history of bargaining between the UMW and the coal producers over the past thirty years and leading to the 1974 Agreement. By inviting the court to take such a journey through the annals of labor history, Kaiser reveals that this case is, in its crucial aspect, just like *Kelly* and every other case in which the party seeking to avoid an allegedly anticompetitive contract delves behind the element of the contract being enforced to the gist of the original bargain. Such an exploration into the purported anticompetitive purpose of a contract clause is precisely what *Kelly* disallows.[7]

■ The affirmative defense of antitrust illegality does not lie against a contract that is "an intelligible economic transaction in itself." *Kelly*, 358 U.S. at 521, 79 S.Ct. at 432. The purchase–of–coal clause, as part of the overall compensation for those covered by the 1974 Agreement, meets this test. The contract has been fully performed by the members of the bargaining unit; they are entitled to the full measure of their bargained–for consideration.[8] If onions must be paid for, so too must past services.[9]

7. At times a court will look to the underlying purpose and effect of a contract to determine whether it is so contrary to public policy that the contract will not be enforced. That is essentially what the Court did in *McMullen v. Hoffman*, 174 U.S. 639, 653–54, 19 S.Ct. 839, 844, 43 L.Ed. 1117 (1899), in which enforcement of a written partnership contract was denied because it was part of a larger oral agreement to bid collusively on certain public works projects. But if *Kelly* is to mean anything, it must mean that such an inquiry is not permitted when it is asserted as an affirmative defense that the contract sued on contravenes federal antitrust law.

8. We cannot accept the dissent's assertion that the payments at issue here were "unearned" and that Kaiser's workers were paid fully for the work they did even though contractually–required payments were not made. Dissenting Opinion 642 F.2d at 1326. The economic rationality and legal propriety of the purchase–of–coal clause is not suspect just because it measures welfare fund contributions by the amount of coal the employer buys from some-

one else. We know of nothing in reason or federal labor law that requires workers to measure their rate of compensation solely by the number of hours performed or the output of their employer.

In *Walsh v. Schlecht*, 429 U.S. 401, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977), there was at issue a clause in a collective bargaining agreement that required an employer to contribute to a union employee–benefit fund at a rate of 96 cents per hour for carpentry work done by non–union workers employed by a subcontractor, which was not itself a signatory of the collective bargaining agreement. The Court enforced the agreement even though the subcontractor's employees were not beneficiaries of the fund and even though the signatory employer had already paid those employees wages at the union scale plus an extra 96 cents per hour as a fringe benefit. The Supreme Court apparently saw no unfairness in this result; we see none here.

It is not unfair to Kaiser that it be required to contribute to the UMW funds after having indi-

## B. *Considerations of Equity and Relative Fault*

█ The hoary maxim that courts will not enforce an illegal bargain is, like many other maxims, only incompletely true. The rule actually employed by the courts is both more complex and more sensitive to nuances of legal relationships. Among the factors which should always be considered in deciding whether to enforce an illegal contract are "the relative guilt of the parties, and the cruelty of the forfeiture involved in a denial of remedy." 6A Corbin on Contracts § 1521, at 759 (1962). *Accord*, Restatement (Second) of Contracts § 420(2) & Comment at 60–61 (Tent. Draft No. 12, 1977). Along these lines, courts will characteristically deny enforcement of a contract on grounds of illegality only if both parties are "*in pari delicto*;" even an illegal contract can be enforced if doing so protects innocent plaintiffs or plaintiffs comparatively more innocent than the defendant, especially when the contract on the plaintiff's side has been fully performed. 6A Corbin on Contracts, *supra*, § 1534, at 818–820, § 1536, at 823–24; 3 Pomeroy's Equity Jurisprudence § 942 (1941); 14 Williston on Contracts, *supra*, § 1630A, at 18–26, § 1631, at 34–38. This is especially so for plaintiffs who serve as representatives for persons wholly innocent of wrongdoing. *See In re Leasing Consultants, Inc.*, 592 F.2d 103, 110–11 (2d Cir. 1979); 15 Williston on Contracts, *supra*, § 1790.

These general principles apply with equal or greater force to cases in which the basis of the illegality defense is an alleged violation of the Sherman Act. In *Viacom International, Inc. v. Tandem Productions, Inc.*, 526 F.2d 593 (2d Cir. 1975), a broadcast network had contracted with the producer of a television series for broadcast, syndication, and distribution rights; it then assigned its distribution rights to Viacom. When Viacom sued for a declaration of its

---

rectly paid a comparable amount to other workers, *see* Dissenting Opinion 642 F.2d at 1326, for this is exactly what it contracted to do. Neither would enforcing the contract as written create a "windfall" for the Trustees. *See id.* It is in the nature of employee–benefit funds—like all transfer–payment schemes—that benefits to some are funded by contributions from others. And it is often the case that payments to beneficiaries do not perfectly correspond to the amount of work they themselves have done. Attempting to ensure the continued viability of such funds by broadening the base of contribution is often actuarially sound.

If the contributions sought had not already been earned by performance, then the Trustees' claim for contract enforcement in this context would have had less force. *See Huge v. Long's Hauling Co., supra*, 590 F.2d at 460; *Associated Press v. Taft–Ingalls Corp.*, 340 F.2d 753 (6th Cir.), *cert. denied*, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965); *Pennington v. United Mine Workers*, 325 F.2d 804, 818 (6th Cir. 1963), *cert. denied*, 381 U.S. 949, 85 S.Ct. 1796, 14 L.Ed.2d 723 (1965). That, however, is not this case.

9. To distinguish this case from *Kelly*, the dissent propounds an analogy between the purchase--of--coal here and the nondelivery agreement alluded to in *Kelly*. Dissenting Opinion 642 F.2d at 1324–1325. That analogy, however, is fundamentally misconceived.

In *Kelly* the Court distinguished the nondelivery agreement (*i. e.*, the agreement to withhold onions from the market) from the contract for the sale of onions. The former, it said, could not be enforced if violative of the antitrust law. 358 U.S. at 521, 79 S.Ct. at 432. The latter would be enforced even though it was allegedly in furtherance of the monopolistic scheme. The analogue to the nondelivery agreement in this case is *not* the purchase -of- coal clause, as the dissent asserts, but rather the alleged agreement to boycott non–UMW coal producers. An agreement like that between a union and group of employers is violative of the antitrust law, *see United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and is unenforceable under the *Kelly* rule. In contrast, the purchase -of--coal clause (like the sale contract for onions) is enforceable under *Kelly* even though its alleged purpose and effect was to further an illegal boycott plan.

The dissent seems to be of the view that the purchase–of–coal clause is a "penalty" on its face simply because "nonunion parties receive no benefits" from its operation. *See* Dissenting Opinion 642 F.2d at 1325. We disagree. *See* note 8, *supra*. On its face, and apart from any consideration of its purpose and effect in a particular context, the purchase--of--coal clause "constitutes an intelligible economic transaction in itself." *Kelly*, 358 U.S. at 521, 79 S.Ct. at 432. Accordingly, *Kelly* requires that the illegality defense be disallowed.

acquired rights, the producer interposed the defense that the underlying contract was violative of the antitrust law. In expressing the opinion of the court, Judge Lumbard emphasized the undesirability of allowing the producer to convert what was, on its face, a simple contract action into one encrusted with the complexities of an antitrust suit, especially when the party to suffer most from so protracting the litigation was innocent of the alleged illegality. 526 F.2d at 599–600. For that reason, it was proper, Judge Lumbard said, "to limit [the producer] to any cause of action it might have against [the broadcast network] rather than to force Viacom to meet the vagaries of an antitrust defense action." *Id.* at 600. The district court's refusal to consider the proffered antitrust defense was, accordingly, affirmed.

■ As the court in *Viacom* shielded the assignee from the alleged antitrust violations of its assignor, so must this court shield the Trustees, and with even more reason. As a rule, third–party beneficiaries, like the Trustees here, are subject to the contract defenses of nonperforming promisors. But the trustees of a union welfare fund are sometimes immune from contract defenses that could be asserted against the union itself because such a rule better serves the concern of federal labor policy to protect union members and their families from the actionable wrongs of their union representatives. *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 468–71, 80 S.Ct. 489, 494, 4 L.Ed.2d 442 (1960). We see no reason for not applying that exemption here.

Not only the special status of the Trustees, but also the questionable conduct of Kaiser must be taken into account. We cannot ignore that Kaiser's way of handling this matter manifests an effort to confound the collective bargaining process and manipulate the judicial process instead.

■ The bargaining history of this contract and its predecessors, as well as the clear language of the 1974 Agreement, shows a concern about the legality of the purchase–of–coal clause. If the clause were adjudged to be illegal or invalid, a renegotiation plan was to go into effect under the terms of the contract. The UMW had an unambiguous contract right to review the bidding if this key clause were stricken. Kaiser does not attack the legality of these contract provisions. Neither does Kaiser challenge the legality of its affirmative obligation under the Agreement to report to the Trustees any purchases of non–UMW coal. Though the Trustees supplied Kaiser with reporting forms that provided for and invited such information, Kaiser failed to disclose it. Kaiser provided information about coal it produced, but left the spaces for purchased coal blank. Even if the purchase–of–coal clause were unlawful, there is no reason to suppose that the reporting provision would fail as well. If Kaiser truly believed the purchase–of–coal clause would not withstand judicial scrutiny, it did not have to wait for others to act. It could have brought an action for declaratory judgment against the UMW. But when another signatory employer brought such a suit,[10] Kaiser stood pat. It was, in sum, Kaiser's choice to adopt a strategy of ignoring its contractual obligations to the Trustees and of not pursuing its opportunities for a timely and direct adjudication of its rights. This whole pattern of conduct betokens such unclean hands that it weighs against permitting Kaiser to raise the illegality defense.[11]

Kaiser's response is that the Trustees' conduct was not beyond reproach. The Trustees knew, Kaiser asserts, all about its

---

**10.** *United States Steel Corp. v. International Union, UMW*, C.A. No. 75–1966 (D.D.C., filed Nov. 24, 1975, decided Oct. 5, 1977) (judgment that Sherman Act not violated by purchase–of–coal clause).

**11.** Ordinarily, one thinks of the doctrine of unclean hands as the sin of the plaintiff—he who

"*comes to court* with unclean hands." But the doctrine can also apply when the plaintiff establishes a right at law and the defendant attempts to interpose a defense which, like the defense of illegality, is overlaid with equitable considerations. *See* H. McClintock, Handbook of Principles of Equity 65 (1948).

outside coal purchases, but they deliberately let the dispute lie fallow until after the Agreement had run its course. Assuming that to be true, it does not affect our view of the central issue on this appeal. The basic conflict here was between Kaiser and the UMW, each attempting to maneuver into a more advantageous position from which to do legal and economic combat. Whatever maneuvering the Trustees might have done was only to stay out of the crossfire. There is nothing wrong with a party's waiting to litigate until all the money it is owed has come due. But using the courts in an effort to circumvent what one has freely bargained for is conduct of a wholly different sort.

Finally, by raising the legality issue only now, after the 1974 Agreement has expired, Kaiser can be protected from the alleged penalty only at the expense of the fund beneficiaries. If Kaiser had raised a timely challenge to the purchase–of–coal clause and won, the union (as guaranteed in the contract) would have had a chance to bargain for a lawful substitute. It might have succeeded in obtaining an increased rate of contribution for coal mined by an employer's own workers to offset what was lost by the invalidation (*ex hypothesis*) of the disputed clause. This would have protected both Kaiser and the beneficiaries from the union's alleged illegal scheme. Now that possibility is lost.

## C. *The Labor Law Illegality*

The second branch of Kaiser's illegality defense fares no better than the first. Kaiser alleges that the UMW insisted on the purchase–of–coal provision to assist it in organizing the workers of a coal producer from whom Kaiser bought coal. If accepted as true, that might convert the challenged provision into a "hot cargo" clause. *See National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644–45, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967). *But see* note 5, *supra*. Even so, section 8(e), like its counterparts in the Sherman Act, cannot be used to create a windfall result. In enacting section 8(e), Congress did not intend to

afford employers the subtle form of self–help Kaiser here claims is its right.

Congress added section 8(e) to the labor law as part of a wider effort to strengthen and clarify the law's existing prohibitions against "secondary boycotts" by labor organizations. Before section 8(e) was passed, a labor union could not, by strike or similar means, coerce an employer into boycotting another employer with whom the union had a dispute, but the union could lawfully exact from employers contractual promises to comply "voluntarily" with such boycotts. *National Woodwork Mfrs. Ass'n v. NLRB, supra*, 386 U.S. at 634, 87 S.Ct. at 1262. For Congress, this was a loophole in the law, which section 8(e) was designed to close. *Id.* But in taking this tack, Congress well knew the disruptive potential of judicially created remedies for labor disputes, especially where labor law and antitrust law overlap. Accordingly, Congress carefully defined the remedies that might be sought for violations of section 8(e) and apportioned those remedies to distinct tribunals, each with its own special competence.

Section 8(e) opens with the language that "[i]t shall be an unfair labor practice" for a union and an employer to agree to a "hot cargo" clause. As with other unfair labor practices, the primary enforcement mechanism for section 8(e) violations is through the Labor Board. Any party aggrieved by a "hot cargo" clause may file a charge with the Board that section 8(e) has been violated. The Board is required to give expeditious consideration to that charge and, in a proper case, to seek injunctive relief in district court. NLRA § 10(*l*), 29 U.S.C. § 160(*l*) (1976). In addition, section 303 of the Labor Management Relations Act, 1947 (LMRA), 29 U.S.C. § 187 (1976), provides a make–whole remedy in the form of an action for damages, but not injunctive relief, in the district court. This remedy is not available for violations of section 8(e) as such but only for violations of section 8(b)(4), 29 U.S.C. § 158(b)(4) (1976), which makes it an unfair labor practice for a union to engage in a strike or

similar conduct where an object thereof is, *inter alia*, to induce an employer to agree to a "hot cargo" clause. Any person "injured in his business or property" by such conduct may sue. Even here, however, limits are imposed. First, the right to damages comes into play only when a union has struck or otherwise coerced the employer into accepting the "hot cargo" clause; it is the coercion and not the clause itself that is the gravamen of this claim. Accordingly, an employer who voluntarily accedes to a "hot cargo" clause–"coerced" only by the desire to avoid an economic strike–has no right to sue for damages but is relegated to an unfair labor practices remedy before the Board. *See Atchison, Topeka & Santa Fe Ry. v. Local 70, Teamsters*, 511 F.2d 1193 (9th Cir. 1975). Second, even those who may sue are limited to the recovery of "actual, compensatory damages," *Teamsters Union v. Morton*, 377 U.S. 252, 260, 84 S.Ct. 1253, 1258, 12 L.Ed.2d 280 (1964), not the treble damages that are available under the antitrust law for comparable forms of economic manipulation. *See generally Connell Construction Co. v. Plumbers Local 100*, 421 U.S. at 639–46, 650–54, 95 S.Ct. at 1848 (Stewart, J., dissenting) (detailing legislative history). Third, recovery in a section 303 damages suit may be obtained only from the union as an entity; the financial resources of individual union members are expressly shielded from judgment. *See* LMRA § 303(b), 29 U.S.C. § 187(b) (1976) (incorporating by reference procedural limitations of LMRA § 301(b), 29 U.S.C. § 185(b) (1976)). When Congress has spoken so directly on the remedies to be provided for statutory violations, it is not for the courts to add remedies of their own. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19–20, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979).

■ To permit an employer to assert a section 8(e) defense in a suit like this would add the remedy of contract avoidance to the other forms of relief which the statute expressly provides. Kaiser argues that this result is mandated by the language of section 8(e) itself, which states that any collective bargaining agreement containing a "hot cargo" clause "shall be to such extent unenforcible [*sic*] and void." This language, Kaiser contends, implies that employers are permitted to sign agreements that violate section 8(e) and then freely ignore what they have signed, defending the breach on grounds of illegality.

The existence of the statutory directive that "hot cargo" clauses are "unenforceable and void" surely must be taken into account. But the existence of such a statutory declaration does not imply that contracts of a certain sort can never be enforced under any circumstances. *See Mills v. Auto–Lite Corp.*, 396 U.S. 375, 387–88, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970); *Occidental Life Ins. Co. v. Pat Ryan & Associates*, 496 F.2d 1255, 1265–67 (4th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974) (upholding payment of contract price notwithstanding that contract violated securities law and statute stated that all such contracts are void). *See generally* 14 Williston on Contracts, *supra*, § 1630A, at 25–26, § 1631A, at 48. The reading which Kaiser suggests for section 8(e)'s "unenforceable and void" language would add to the remedies Congress expressly provided an independent remedy available at all times and against all parties. Because this remedy would exceed what is required to give meaning to the statutory language and would impede the effective operation of the labor law, we cannot agree that it is what Congress had in mind.

As noted above, the primary enforcement mechanism for section 8(e) violations is an unfair labor practice proceeding before the Labor Board, which may lead to a cease–and–desist order from the Board or a Board–initiated injunction from the district court. Other provisions of the NLRA further restrict a union from securing indirectly the benefits of a "hot cargo" clause. For example, even when "hot cargo" clauses were legal, a union could not conduct a secondary boycott strike under the guise that it was merely striking to enforce the previously negotiated "hot cargo" provision of its collective bargaining agreement. *See*

*NLRB v. Enterprise Ass'n of Pipefitters,* 429 U.S. 507, 515–17, 97 S.Ct. 891, 896, 51 L.Ed.2d 1 (1977). In addition, when section 8(e) is read in conjunction with section 8(b)(4)(A), a union is prevented from using its economic power to compel an employer to agree in advance to honor a secondary boycott the union might impose at a later time. In this context, the "unenforceable and void" language simply provides a third prophylactic device, preventing a union from obtaining specific performance of a "hot cargo" clause should a union and an employer, unlawfully, agree to one. In short, by making "hot cargo" clauses "unenforceable and void," Congress intended to prevent unions from compelling through judicial enforcement of collective bargaining agreements the very conduct that the union could not compel by its economic might. Whether Congress meant anything more than that is not apparent from the words it used.

Allowing Kaiser to assert a section 8(e) defense in this suit would not only expand its remedies beyond what is necessary to give full effect to the language of the Act but would also interfere with protection to others that the labor law affords. In this case, the Trustees have claimed jurisdiction under both section 301 of the LMRA, authorizing court enforcement of collective bargaining agreements, and section 502 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132 (1976), similarly intended to enforce pension obligations. Suits like the one the Trustees bring here are, in the full gamut of modern litigation, relatively simple affairs. At most they require the court to determine what a particular contract provision means and whether its obligations have been fulfilled. In contrast, a secondary boycott case is, characteristically, more intricate and somewhat arcane. To decide whether a particular contract clause violates section 8(e), it must be determined whether, "under all the surrounding circumstances," the clause is "addressed to the labor relations of the contracting employer *vis-à-vis* his own employees," rather than being "tactically calculated to satisfy union objectives else-

where." *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. at 644–45, 87 S.Ct. at 1268. The Supreme Court may have understated when it said, "[t]his will not always be a simple test to apply." *Id.* See *NLRB v. International Longshoremen's Ass'n,* 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980). Thus, if Kaiser were allowed to go forward with its section 8(e) claim as an affirmative defense, it could interject into an otherwise simple contract–enforcement suit complex and disputed questions about the conduct and motives of those who negotiated the underlying agreement. This would be unfair to the Trustees and would unwisely interfere with the orderly remedial processes contemplated by the labor law. *Cf. Viacom, supra,* 526 F.2d at 599–600. This court would be loathe to foster such a result.

Finally, this court's interpretation of section 8(e) must be informed by the overall scheme of national labor policy. A crucial aspect of that scheme is that the National Labor Relations Board is vested with primary jurisdiction for determining what is or is not an unfair labor practice. As the Supreme Court said in *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244–45, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959), "courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board." *Accord, Garner v. Teamsters Union,* 346 U.S. 485, 490–91, 74 S.Ct. 161, 165, 98 L.Ed. 228 (1953).

The evolution of the body of law committing certain labor law questions to the primary jurisdiction of a national body of experts has not been free of complications. But the desirability of such a doctrine has hardly been questioned by either policymakers or the courts. As Justice Harlan said in *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 288, 91 S.Ct. 1909, 1918, 29 L.Ed.2d 473 (1971):

The rationale for pre–emption, then, rests in large measure upon our determination that when it set down a federal

labor policy Congress plainly meant to do more than simply to alter the then–prevailing substantive law. It sought as well to restructure fundamentally the processes for effectuating that policy, deliberately placing the responsibility for applying and developing this comprehensive legal system in the hands of an expert administrative body rather than the federalized judicial system. The objective of such an approach was "to avoid conflicting regulation of conduct by various official bodies which might have some authority over the subject matter." *Id.* at 285–86, 91 S.Ct. at 1917. Thus, the primary jurisdiction doctrine carefully defines the coordinate responsibilities of the Labor Board and the federal courts in enforcing Congress' prohibition of unfair labor practices. Because it is such a basic feature of our labor law, it is not to be lightly disturbed, especially without a clear congressional mandate for change. *Id.* at 302, 91 S.Ct. at 1925. Exceptions have been and will continue to be made, but they are exceptions which are accordant with the grand scheme envisioned by Congress.

■ Congress altered the basic scheme when it enacted section 301 of the LMRA, authorizing suits in federal district court to enforce collective bargaining agreements. Consonant with that change, federal courts have independent jurisdiction to decide cases alleging the breach of collective bargaining agreements, even though that very breach may also be an unfair labor practice. *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 266–68, 84 S.Ct. 401, 406, 11 L.Ed.2d 320 (1964); *Smith v. Evening News Ass'n*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). But the court's statutory authority to adjudicate contract disputes under section 301 does not imply that it has jurisdiction to entertain every conceivable affirmative defense.

If an employer were allowed to interpose the section 8(e) defense in any suit to enforce a collective bargaining agreement, there would be nothing left of the Board's primary jurisdiction for section 8(e) cases. An employer could effectively circumvent the authority of the Board simply by doing what Kaiser suggests: freely ignore an agreement it signed and then defend in an action to enforce it on the ground that it violated section 8(e) and could not be enforced. To allow that result would undermine the enforcement scheme Congress endeavored to devise and would be inconsistent with the principle of primary jurisdiction that has so long been a part of federal labor law.

We do not accept the argument that the Supreme Court's decision in *Connell Construction Co. v. Plumbers Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), signals a retreat from the primary jurisdiction doctrine where section 8(e) violations are concerned. *Connell* does not hold, nor does it imply, that employers may interpose the alleged violation of section 8(e) as a defense in a contract enforcement suit even though they have not previously pursued their remedies before the Labor Board.

In *Connell*, an employer filed suit complaining that an agreement it had signed under the duress of a union strike violated the Sherman Act. The union sought to interpose a defense under section 8(e), claiming that its language overrode the earlier–enacted Sherman Act. To its more general defense that section 8(e) shields unions generally from antitrust liability, the union added a more particular variation. The union asserted that as a construction union, it was shielded from antitrust liability because, in its view, the so–called construction–industry proviso of section 8(e) specifically authorized the kind of agreement being challenged in that suit. The Court in *Connell* rejected both of these claims to antitrust immunity.

■ In deciding that the construction–industry proviso did not apply to the agreement under consideration, the Court remarked that "the federal courts *may* decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies, including the antitrust laws." 421 U.S. at 626, 95 S.Ct. at 1837 (emphasis added) (footnote omitted). Al-

though *Connell* clearly says that a federal court *may* decide "collateral" labor law issues in certain cases, it does not say that such issues must always, or even should always, be addressed. The overriding concern is still whether the exercise of judicial jurisdiction is consistent with the national labor policy ordained by Congress.

In *Connell*, it must be noted, the union was not claiming that an unfair labor practice had been committed but that the agreement sued on was explicitly allowed by the construction–industry proviso to section 8(e). That question could not have been addressed by the Labor Board because it does not have jurisdiction to decide the scope of section 8(e) absent a charge that an unfair labor practice has occurred. As a consequence, there was no mechanism for the administrative adjudication of the "collateral" labor law issue which the Court undertook to resolve. Similar factors were at play in *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 687, 85 S.Ct. 1597, 1600, 14 L.Ed.2d 640 (1967) (opinion of White, J.), the primary case on which the *Connell* Court relied for the proposition that collateral labor law issues may be decided. In contrast, in the case now under review, there was "an available procedure for obtaining a Board determination," *Meat Cutters v. Jewel Tea Co.*, 381 U.S. at 687, 85 S.Ct. at 1600, of precisely the labor law

issue which Kaiser seeks to interpose. Kaiser could have filed a charge with the Board alleging a violation of section 8(e), but it did not. If Kaiser had been victimized by the UMW, that would have been its appropriate means of redress. But the district court does not acquire jurisdiction to decide in the first instance whether an unfair labor practice has been committed just because the party alleging it chose to forgo the administrative remedy Congress expressly provided for the illegality it defined.[12]

In concluding that the "unenforceable and void" language of the statute does not permit a party to interpose an alleged violation of section 8(e) as an affirmative defense to a contract enforcement suit, we have relied on the language of the entire statutory section, its interrelationship with other statutory provisions, and its role in the overall statutory scheme. A statutory construction thus derived is preferred unless the legislative history of the disputed provision clearly shows that Congress meant something else. *See Transamerica Mortgage Advisors, Inc. v. Lewis, supra,* 444 U.S. at 20, 100 S.Ct. at 247; *National Small Shipments Conference, Inc. v. CAB,* 618 F.2d 819, 828 (D.C.Cir.1980). We have carefully reviewed the legislative history of the "unenforceable and void" language of sec-

---

**12.** Kaiser argues that the contrary is indicated by a comment of Justice Stewart in *Connell.* So, too, does the dissent. Dissenting Opinion 642 F.2d at 1333. But the comment referred to was made in a footnote to Justice Stewart's dissent in that case, 421 U.S. at 649 n.9, 95 S.Ct. at 1849 n.9, and is not controlling here. More important, the comment, when read in context, is not inconsistent with the view expressed in this opinion.

Justice Stewart addresses in his footnote the legal consequences that befall an employer who signs voluntarily a "hot cargo" clause. He notes that if the employer complies with the clause and refuses to deal with another business, that business may have a valid antitrust action against the boycotting or "neutral" employer. This possible liability for damages can be avoided, Justice Stewart says, simply by the employer's refusal to comply with the "hot cargo" clause. He then concludes, "Since § 8(e) provides that any prohibited agreement

is 'unenforceable and void,' any union effort to invoke legal processes to compel the neutral employer to comply with his purely voluntary agreement would obviously be unavailing." 421 U.S. at 649 n.9, 95 S.Ct. at 1848.

Taken in context, all this means is that the court will not compel an employer to engage in conduct violative of the antitrust law by granting specific performance of an illegal, "hot cargo" clause. *See* 642 F.2d at 1312, *supra.* However, the case here under review is not a suit for specific performance but for payment of a sum owing and due. A court order compelling Kaiser to make payments to the Trustees now that the 1974 Agreement has expired would not force Kaiser to do anything prohibited by either section 8(e) or the Sherman Act and would not subject Kaiser to antitrust liability from someone else. The problem Justice Stewart was addressing in his footnote does not arise.

tion 8(e) and are satisfied that it does not indicate a contrary intent.[13]

■ For the foregoing reasons we conclude that an alleged violation of section 8(e) may not be raised as a defense in a suit under section 301 to enforce the underlying collective bargaining agreement by a party that has abstained from first pursuing its remedies before the Labor Board.

### D. *Availability of Other Remedies*

Our decision today does not eliminate Kaiser's right to a remedy but only its asserted right to a remedy at a time, in a forum, and against a party of its choosing. Kaiser has had adequate opportunities to test its claim that the union overreached in obtaining the purchase–of–coal clause in the 1974 Agreement.

■ If the clause violated the provisions of section 8(e), Kaiser could have sought the processes of the Board to right the wrong. After a charge that the purchase–of–coal clause violated section 8(e) had been made, the Board's General Counsel would be responsible for determining whether to issue a complaint and thus commence the Board's process of adjudication. *See* NLRA § 10(b), 29 U.S.C. § 160(b) (1976). That the General Counsel has unreviewable discretion to refuse to issue an unfair labor practice complaint, *see Associated Builders & Contractors v. Irving*, 610 F.2d 1221, 1226 (4th Cir. 1979); *National Alliance of Postal Employees v. Klassen*, 514 F.2d 189, 197 (D.C.Cir.), *cert. denied*, 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975), is itself further proof that Congress wanted decisions of this sort to be made initially by the national repository of labor expertise. *See generally Associated Builders & Contractors v. Irving, supra*, 610 F.2d at 1224–26. To allow an employer to bypass the Board by stating its objection for the first time in court as a defense to a lawsuit by other parties on other issues would destroy the congressional plan.

■ The same is true about Kaiser's claims under the Sherman Act. If Kaiser had cause, that Act gave it the right to sue

---

13. The "unenforceable and void" language was first introduced during floor debate by Senator Smathers in an amendment that would also have brought section 8(e) violations within the mandatory injunction provisions of section 10(*l*). 105 Cong.Rec. 6033 (daily ed. Apr. 25, 1959), *reprinted in* II Legislative History of The Labor–Management Reporting and Disclosure Act of 1959, at 1242 (1959) [hereinafter cited as Legis.Hist.] Senator Smathers' remarks clearly show that it was his understanding that the policing mechanism for section 8(e) violations would be the mandatory injunction provisions of section 10(*l*). *See id.* Remarks by Senator Goldwater some weeks later reflect a similar understanding. 105 Cong.Rec. 9118 (col. 2) (daily ed. June 8, 1959), *reprinted in* II Legis. Hist. at 1290. In the course of debate, several legislators remarked that what is now section 8(e) would make "hot cargo" clauses "unenforceable and void," but very rarely did these legislators clearly articulate what they thought that meant.

The most substantial support for the view that "hot cargo" illegality might be raised as an affirmative defense in a contract enforcement suit is found in a statement by Senator Goldwater, in which he said:

[Section 8(e)] means that ["hot cargo"] contractual clauses are per se illegal. It is unlawful for either party even to execute such an agreement, to insist that the other party bargain about or enter into it, to use any form of coercion or restraint—economic or otherwise—to compel the other party to enter into it or to live up to it even if his refusal to do so is in breach of a voluntary agreement to abide by the agreement, and finally, such breach does not constitute a good cause of action in a suit at law to recover damages for the breach or to secure specific performance of the agreement.

105 Cong.Rec. A8523 (col. 3) (daily ed. Oct. 2, 1959), *reprinted in* II Legis.Hist. at 1857. This statement was included in an "extension of remarks"–not something actually said in the course of legislative debate but rather a statement appended to the official record at some other time–after the bill had already been signed into law. The statement is not inconsistent with our construction of section 8(e). Whether a union can obtain specific performance, or even damages for breach, on a contract that is still executory and clearly violative of section 8(e) is a different question from whether the trustees of a welfare fund may recover money due on a contract already fully performed on the union side and only arguably violative of section 8(e). Accordingly, Senator Goldwater's statement is not controlling evidence of congressional intent as to the meaning of the "unenforceable and void" language of section 8(e), as that language relates to the issue on this appeal.

the union directly, and seek damages three-fold for what it had suffered. Presumably, such a claim would encompass any improper amounts paid the Trustees. In any event, such a suit would pit the proper parties against each other in a contest raising squarely the competing considerations of antitrust policy and labor law. That is a dispute that courts can and would resolve.

It is an entirely different question whether Kaiser should have still another means of redress, especially a remedy like the illegality defense which is not favored by the law. As the Supreme Court has said:

> It has been often stated in similar cases that the defence [of illegality] is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations and in order the better to secure the public against dishonest transactions.

*McMullen v. Hoffman*, 174 U.S. 639, 669, 19 S.Ct. 839, 851, 43 L.Ed. 1117 (1899), *quoted in Kelly v. Kosuga, supra*, 358 U.S. at 519, 79 S.Ct. at 431. When other avenues are open, the defense is even more unseemly. "Unless the public interest requires, we are reluctant to nullify a contract which has been executed, and this is especially true where the parties have other remedies at their disposal *which will produce an equitable result.*" *Occidental Life Ins. Co. v. Pat Ryan & Associates, Inc., supra*, 496 F.2d at 1267 (empahsis in original) (interpreting Securities Exchange Act § 29(b), 15 U.S.C. § 78cc(b) (1976), which declares that contracts in violation of that act "shall be void"). In fact, the defense of contract illegality should ordinarily be allowed only when the public interest served by permitting the defense clearly outweighs the public interests that militate in favor of contract enforcement. *See A. C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38, 44, 61 S.Ct. 414, 417, 85 L.Ed. 500 (1941); *In re Leasing Consultants, Inc.*, 592 F.2d at 110; *California Pacific Bank v. Small Business Adm'n*, 557 F.2d 218, 224 (9th Cir. 1977); 3 Pomeroy's Equity Jurisprudence, *supra*, § 941; *cf. Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 752–54, 67 S.Ct. 1015, 1019, 91 L.Ed. 1219 (1947). When the contract in question is a collective bargaining agreement, those countervailing interests are especially acute.

A collective bargaining agreement is more than a contract between private parties; it is a charter for the "system of industrial self–government" envisioned by federal labor law. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960). Recognizing this, the courts have not been reluctant to refashion more general principles of contract law when they conflict with the overriding goals of national labor policy. *John Wiley & Sons v. Livingston*, 376 U.S. 543, 550, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964); *United Steelworkers v. Warrior & Gulf Navigation Co., supra*, 363 U.S. at 582–83, 80 S.Ct. at 1352; *Lewis v. Benedict Coal Corp., supra*, 361 U.S. at 467–71, 80 S.Ct. at 494. At times, those goals require that otherwise lawful prerogatives must "be balanced by some protection to the employees from a sudden change in the employment relationship." *John Wiley & Sons v. Livingston*, 376 U.S. at 549, 84 S.Ct. at 914. At other times, access to a judicial remedy is made conditional on the parties' prior resort to other remedial processes, so as to better achieve the "stabilizing influence of the collective bargaining contract." *Drake Bakeries Inc. v. Local 50, Bakery Workers*, 370 U.S. 254, 263–64, 82 S.Ct. 1346, 1352, 8 L.Ed.2d 474 (1962).

Those same considerations are applicable here. The twin goals of protecting the integrity of the collective bargaining agreement and of fostering the orderly administration of federal labor law would be weakened if an employer could simply ignore putatively unlawful provisions of a collective bargaining agreement and then challenge the lawfulness of those provisions as an affirmative defense after the contract expired. Given the facts of this case, it would better serve both equity and national labor policy if the Trustees were allowed to recover the required contributions to the welfare funds unimpeded by Kaiser's belated assertion of illegality.

### III. ATTORNEYS' FEES

The district court awarded attorneys' fees to the Trustees. The parties dispute whether the district court had authority to make such an award.

The Trustees argue that jurisdiction of this section is conferred by both section 301 of the LMRA and section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3) (1976). For actions brought under the latter, the district court has explicit statutory authority to award such attorneys' fees as, in its discretion, are appropriate. ERISA § 502(g), 29 U.S.C. § 1132(g). Kaiser replies that the gist of this action is the alleged violation of a collective bargaining agreement–properly maintainable under section 301 but not under section 502 of ERISA. It is true that as a general rule, attorneys' fees may not be awarded in a section 301 suit unless there is a showing of "bad faith." *See National Ass'n of Letter Carriers v. United States Postal Serv.*, 590 F.2d 1171, 1176 & n.5 (D.C.Cir.1978); *Cronin v. Sears, Roebuck & Co.*, 588 F.2d 616, 619–20 (8th Cir. 1978). *But see Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1116–17 (9th Cir. 1979). We do not believe, however, that section 301 of the LMRA and section 502 of ERISA are so surgically discrete that an action to compel welfare fund contributions required by the terms of a collective bargaining agreement cannot be maintained under both sections. In numerous cases, both within this circuit and elsewhere, district courts have allowed suits like this to proceed under both LMRA and ERISA, and have awarded attorneys' fees pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).[14] We conclude, therefore, that the district court had jurisdiction of this action under section 502 of ERISA, as well as under section 301 of LMRA. We further conclude that the district court did not abuse its discretion in awarding attorneys' fees to the Trustees.

The judgment of the district court is *Affirmed.*

WILKEY, Circuit Judge, dissenting:

This appeal raises the question whether a purchase–of–coal penalty clause may be enforced against appellant steel company even if the clause violates antitrust and labor laws. The district court held that the legality of the clause was irrelevant and struck the illegality defense. My colleagues agree with the analysis of the district court. Since I know of no reason in law or logic why any court should enforce a contract clause which plainly violates the law specifically designed to prohibit such clauses, I dissent. Necessarily, the district court's award of attorney's fees to appellee trustees cannot stand.

### I. BACKGROUND

Since the 1940's the United Mine Workers of America (UMWA) has sought through various clauses in collective bargaining agreements to encourage signatories to purchase coal from other signatories only. In the 1940's and 1950's some agreements included a "no subcontracting clause," prohibiting subcontracting by UMWA operators for the mining and loading of coal.[1] The 1958 agreement included a "protective wage clause" prohibiting the purchase of coal from operators providing wages and benefits below those paid under the UMWA contract.[2] In 1964 the purchase–of–coal clause was included in the agreement, calling for the payment to the UMWA health

14. *See, e. g., Mullins v. Reitz Coal Co.*, C.A. No. 78–0715 (D.D.C. Mar. 23, 1979); *Huge v. Reid*, 468 F.Supp. 1024 (N.D.Ala.1979); *Huge v. Maximeadows Mining Co.*, 459 F.Supp. 267 (N.D.Ala.1978); *Bugher v. Southland Fabricators, Inc.*, 452 F.Supp. 870 (W.D.La.1978); *Sheet Metal Workers Pension Fund v. Young's Roofing, Inc.*, C.A. No. 77–1849 (D.D.C. May 3, 1978); *Huge v. Overly*, 445 F.Supp. 946 (W.D. Pa.1978); *IAM National Pension Fund v. Ward La France Truck Corp.*, C.A. 77–1206 (D.D.C.

Feb. 1, 1978); *Bugher v. Frash*, 98 L.R.R.M. 3010 (S.D.Ind.1977).

1. *See, e. g.*, Kanawha District Agreement at 34–35 (22 Aug. 1941), *reprinted in* Joint Appendix (J.A.) at 483.

2. National Bituminous Coal Wage Agreement of 1950 as Amended, Effective 1 December 1958, at 2–3, *reprinted in* J.A. at 485.

and pension fund of $.80 for each ton of coal purchased from a nonsignatory.[3] Kaiser Steel submits that the purpose of such clauses was and is to aid the UMWA in organizing the nonsignatories;[4] the trustees submit that the purpose of the clauses is to deal with the threat to the work and work standards of UMWA employees presented by the purchase of cheap coal by signatories from producers having subunion wages, fringe benefits, and working conditions.[5]

Until 1971 the UMWA agreements left the steel companies free to purchase non–UMWA coal for use in their manufacture of steel.[6] But beginning in 1971, the purchase–of–coal penalty clause was included in the UMWA agreements with the steel companies.[7] The clause here challenged, part of the 1974 agreement, required signatories to contribute to the union health and pension funds $1.182 for each ton of coal purchased from non–signatories in 1974, $1,456 in 1976, and $1.55 in 1977.[8] Thus, in addition to the amounts that UMWA operators must contribute to those funds based on coal tonnage actually produced and hours worked by UMWA members, the contract requires contributions for each ton of coal purchased from *non*signatories.

From the time the agreement was signed, Kaiser Steel refused to make any penalty payments or even to report purchases of coal.[9] Kaiser submits that the trustees of the UMWA funds must have known since at least 1971 about Kaiser's purchases from Mid–Continent (a nonsignatory).[10] The trustees say they did not know that Kaiser was purchasing coal from nonsignatories until near the end of the 1974 contract period.[11] After the contract expired the trustees sued Kaiser Steel to obtain the contributions called for by the purchase–of–coal clause agreement.

In the district court Kaiser defended the action on the basis that the purchase–of–coal clause violated the Sherman Act[12] and section 8(e) of the Labor–Management Relations Act.[13] On motion for summary judgment, the district court ruled that the claimed illegality of the clause was not a valid defense in this action. Allegedly following *Kelly v. Kosuga*,[14] the court rejected the antitrust defense, finding that "requiring payments pursuant to the purchase–of–coal clause cannot be said to be enforcing a restraint of trade within the meaning of *Kelly*" because the 1974 agreement had expired, and that "decisions to purchase or not to purchase have been made and acted upon."[15] The court held that the section 8(e) challenge to the clause was not a valid defense because that claim had not been raised before the NLRB in a timely fashion.[16] Finally, the court ordered Kaiser Steel to pay plaintiffs' attorney's fees.[17]

## II. ENFORCEMENT OF AN ILLEGAL CLAUSE

On the question of illegality, my colleagues do *not* purport to hold that the clause is *legal*; rather, they believe that

**3.** National Bituminous Coal Wage Agreement of 1950 as Amended, Effective 2 April 1964, at 2, *reprinted in* J.A. at 589.

**4.** Brief for Appellant at 4.

**5.** Brief for Appellees at 9.

**6.** *See* Letter from Charles M. Heath to W. A. Boyle (21 Oct. 1968), *reprinted in* J.A. at 492; Affidavit of S. W. Zanolli at 6 (18 Oct. 1978), *reprinted in* J.A. at 479.

**7.** *See* Affidavit of S. W. Zanolli at 6 (18 Oct. 1978), *reprinted in* J.A. at 479.

**8.** National Bituminous Coal Wage Agreement of 1974 at 28, *reprinted in* J.A. at 491.

**9.** Kaiser's remittance forms during the period at issue are *reprinted in* J.A. at 192–275.

**10.** Brief for Appellant at 7–8.

**11.** Brief for Appellees at 6.

**12.** 15 U.S.C. §§ 1, 2 (1976).

**13.** 29 U.S.C. § 158 (1976).

**14.** 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959).

**15.** 466 F.Supp. 911, 915 (D.D.C.1979).

**16.** *Id.* at 916–17.

**17.** *Id.* at 917.

the alleged illegality of the clause under labor and antitrust law is *irrelevant*. They say:

> The narrow issue on appeal, therefore, is not whether an illegal contract clause should be enforced but rather whether Kaiser's proffered defense of illegality should be entertained.... [T]he district court decided that Kaiser was not entitled to interpose the illegality defense. This, we now hold, is correct.[18]

This is a fair statement of the trial court's ground of decision, and of the position in which the issue comes to us, but the answer given is wrong on at least two counts.

In the first place, if Kaiser is not entitled to judicial consideration of the clause's illegality as an affirmative defense, it may very well be held to have waived any challenge to it anywhere, anytime. Federal Rule of Civil Procedure 8(c) states that "a party shall set forth affirmatively ... illegality" as an affirmative defense. A defendant's failure to raise the issue of illegality under the applicable substantive law may result in a waiver of that claim.[19] If an affirmative defense is not treated as the equivalent of an action for enforcement to test the substantive law, then the lawful character *vel non* of a contract clause is left behind in a handicapped "race to the courthouse."

In the second place, there are only two logical grounds on which a court can order enforcement of a contract clause whose legality has been challenged: (1) The court can find that the clause is legal, or (2) the court can assume (or find) the clause to be illegal and enforce it for other reasons. In my view, neither option is tenable in this case. The first is foreclosed because no finding has been made that the clause is legal. With respect to the second, I believe

that if the clause is illegal, it is unenforceable, as I shall proceed to show.

A. *The Principles of* Kelly v. Kosuga *Prohibit Enforcement of an Illegal Clause*

In *Kelly v. Kosuga*[20] plaintiffs sold onions to defendant at an agreed-upon price. The parties made an *additional* agreement not to deliver onions to the futures market in order to keep the price of onions high. The defendant-purchaser took delivery of some of the onions and refused to pay the agreed-upon purchase price. When the plaintiff-seller sued for the purchase price, the purchaser defended on the basis that the agreement to withhold the onions from the futures market violated the antitrust laws and precluded enforcement of his contractual obligation to pay for the onions. In rejecting the defense, the Supreme Court noted that antitrust defenses to contract actions have "not met with much favor," particularly when a vendor seeks to recover an agreed-upon price for goods sold.[21] It reasoned that "*[p]ast the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act*, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, 'of preventing people from getting other people's property for nothing when they purport to be buying it.'"[22]

With these principles in mind, the Court found that although "the nondelivery agreement between the parties could not be enforced by a court, if its unlawful character under the Sherman Act be assumed," giving "legal effect to a completed sale of onions at a fair price" would not "enforce a violation of the Act."[23] Thus, reasoned the Court, "while analysis in terms of 'divisibility' or some other verbal formula may well be circular, ... in any event, where, as

---

**18.** Majority Opinion at 1308.

**19.** *See Stanish v. Polish Roman Catholic Union of America*, 484 F.2d 713 (7th Cir. 1973); 2A Moore's Federal Practice ¶ 8.27[3] (1979).

**20.** 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959).

**21.** *Id.* at 518, 79 S.Ct. at 430.

**22.** *Id.* at 520–21, 79 S.Ct. at 432 (quoting *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 271, 29 S.Ct. 280, 296, 53 L.Ed. 486 (1909) (Holmes, J., dissenting) (emphasis added).

**23.** *Id.* at 521, 79 S.Ct. at 432 (emphasis added).

here, a lawful sale for a fair consideration constitutes an *intelligible economic transaction in itself*, we do not think it inappropriate or violative of the intent of the parties to give it effect even though it furnished the occasion for a restrictive agreement of the sort here in question." [24]  On that basis the Court reaffirmed the common–law rule that the illegality of a portion of a contract does not prevent a court from enforcing a severable legal portion of that contract.[25]

1.  *Enforcing The Purchase–Of–Coal Clause Implements Conduct Proscribed By Law*

Because the purchase–of–coal clause in itself is violative of antitrust and labor law (as we must assume on this summary judgment [26]) *Kelly* forbids its enforcement.[27]

---

**24.**  *Id.* (emphasis added) (citation omitted).

**25.**  *See* 6A Corbin §§ 1518–1531 (1962).

**26.**  The court questions in footnote 6 of the majority opinion whether "the illegality of the disputed clause must be assumed because this is an appeal from a summary judgment," citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1368, at 692–93 (1969).  That authority, *id.* at 693, states, however, that:

In addition to assuming the truthfulness of the actual allegations for purposes of the motion, *all reasonable inferences and intendments from these facts are drawn in favor of the nonmoving party.* [citations omitted] In *National Labor Board v. Weirton Steel Company,* [146 F.2d 144 (3d Cir. 1944)], for example, the NLRB brought a contempt proceeding for violation of a decree involving certain unfair labor practices and moved for a partial summary judgment on the pleadings.  The Third Circuit refused to grant the motion, although it recognized that by drawing certain inferences from the facts, the conclusion sought by the Board might be supported.  The court stated;

but, a court is without right to draw inferences favorable to a movement for summary judgment on [the] pleadings.  In that situation, all reasonable intendments and inferences from the pleadings are, as a matter of law, to be taken against the movement and in favor of the opponent. [*Id.* at 145]

Surely, the manifest implications in Kaiser's pleadings would support judicial inference regarding the antitrust defense.  These inferences are sufficient to vitiate the propriety of the district judge's refusal to entertain the antitrust defense without receiving any proof at all of the subject.

Kaiser contends that the purchase–of–coal clause violates the antitrust laws because it is a group boycott against nonsignatory coal companies.  Nonsignatories are injured by the clause because UMWA operators are deterred economically from making purchases from them.[28]  Signatories are injured because they must choose between restricting their purchases to other signatories or paying a "penalty" when purchasing from nonsignatories.

The district court held that enforcing the clause would not make the court a "party to the carrying out one of the very restraints forbidden by the Sherman Act."  It reasoned that because the 1974 agreement had expired and decisions to purchase or not to purchase had already been implemented, enforcement would not cause Kaiser to refrain from purchasing non–UMWA coal.[29]

---

**27.**  The majority's discussion of *Kelly* is simply conclusory.  Though the majority purports not to be examining the application of the Sherman Act to the contract clause at issue in this litigation, footnotes 5–7 to the court's opinion appear to assume *sub rosa* an antitrust holding favoring appellees.  This is inappropriate in an appeal taken from a summary judgment granted below, when the trial court never reached the question of illegality.  Nevertheless, their reliance on *Kelly* in this case, where enforcement of the clause in question has the necessary effect of restraining trade with nonunion coal producers, is totally indefensible, whatever the ultimate decision on the merits on other grounds.

**28.**  In order to compete for business from designatories, nonsignatories must lower their prices to make it economically feasible for UMWA operators to pay the purchase price and make a contribution to the health and pension funds as well.

**29.**  The trustees argue that because Kaiser continued to make purchases from nonsignatories, "there was no boycott of nonunion coal producers."  Therefore, they submit the clause does not lead to conduct proscribed by the Sherman Act, and the exception to *Kelly* is inapplicable.  Brief for Appellees at 27.  In other words, the trustees argue that the antitrust defense may not be raised because there was no antitrust violation.  And Kaiser may not prove the antitrust violation because the antitrust defense may not be raised.  This is blatant circular reasoning and is unacceptable.

That Kaiser continued to make purchases from nonunion coal companies does not prove

Observe that the district court did *not* hold that if the contract were current, enforcement of the illegal clause would be authorized.

But my colleagues go further. They ask: "how can the court be a party to an anti-competitive scheme simply by enforcing a contract which requires employers to make payments into a union's health and retirement funds?" "Elementary, my dear Watson": simply because the payments compelled by the court are payments under the illegal contract, an effort to enforce an illegal secondary boycott.[30] Furthermore,

there is the impingement on Kaiser's purchasing discretion, an interest the antitrust laws were meant to protect. Kaiser has an interest in being able to make purchases from "boycotted" companies without being required to pay penalties for so doing.

*Requiring Kaiser to make these penalty payments is enforcement of the precise conduct made unlawful by the antitrust laws.* Just as the Supreme Court observed that the nondelivery agreement in *Kelly* "could not be enforced by a court, if its unlawful character under the Sherman Act be assumed,"[31] so also I conclude that the pur-

---

that the purchase–of–coal clause had no deterrent effects. It may well be that the only reason Kaiser did so was that it believed it would not have to pay the purchase–of–coal "penalty," and therefore did not take that into consideration in its purchasing decisions. In any event, Kaiser should first be allowed to make its case that the clause had anticompetitive effects before a court concludes on summary judgment that the defense must be disallowed because no violation occurred.

**30.** Are natural consequences of intended acts irrelevant? More sophisticated scrutiny would not so blithely overlook the necessary effects of the clause cooked up by the union. The effects of that clause are clearly injurious to nonunion producers *and* their employees. The majority opinion, reluctant to draw inferences about the anticompetitive character of the clause, is much quicker to draw the inference that the purchase–of–coal clause was intended to counteract wage competition among coal producers, *see* footnote 5 of the majority opinion.

The "wage competition" issue diverts attention away from the proper focus for attention on this appeal. There has been no finding whatsoever that the employees of nonunion producers received less advantageous wages than unionized employees. Moreover, courts have traditionally looked beyond the facial appearance of challenged activities. In *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), the Supreme Court labeled as price fixing a concerted program whereby oil companies entered the oil market as buyers. The Court held that this buying program represented price fixing, a *per se* violation of the Sherman Act. The violation resulted from the *necessary effect* that the program would have on prices. It is important to note that the necessary effect was proscribed *regardless of whether* "the conspirators had the means available for accomplishment of their objective." *Id.* at 225 n.59, 60 S.Ct. at 845. Here, just as in *Socony–Vacuum,* the anticompetitive effect can be inferred from the

consequences logically entailed by the operation of the purchase–of–coal clause. The following quote from Sullivan, Antitrust 313 (1977) is informative:

> [W]here the course agreed upon is not explicitly to fix prices or divide territories, there may also be, as there was in *Socony–Vacuum*, inference involved in the conclusion that the purpose and effect of what was expressly agreed upon is tantamount to price fixing or market division or that the purpose and effect (though not capable of being assimilated under one of the *per se* violations) is nevertheless unreasonable. [footnote omitted] Inference, be it understood, may be involved in one or more of several steps in the analysis, in deciding that an agreement took place, in concluding that the agreement which did take place should be characterized in a way which offends a *per se* rule, or in concluding that the agreement is, on balance, unreasonable.

**31.** 358 U.S. at 521, 79 S.Ct. at 432.

The majority opinion confounds the ostensible purpose of the purchase–of–coal clause and its necessary effects. The majority writes in footnote 9: "On its face, and apart from any consideration of its purpose and effect in a particular context, the purchase–of–coal clause 'constitutes an intelligible economic transaction in itself.' *Kelly*, 358 U.S. at 521, 79 S.Ct. at 432. Accordingly, *Kelly* requires that the illegality defense must be disallowed." This is another instance of the majority's failing to recognize that however "intelligible" the purchase–of–coal clause is, it is *itself* the offensive clause under the antitrust laws. When the court enforces this clause it promotes the necessary effects of the clause and harms the economic interests of both sellers and buyers of nonunion coal. The antitrust violation is implicit in the purchase–of–coal clause itself; there is no allegation that any other part of the collective bargaining agreement between the union and Kaiser is violative of the antitrust laws.

chase–of–coal clause is unenforceable if it is assumed to violate the antitrust laws. The *legal* part of the contract in *Kelly* was the sale and delivery of the particular load of onions, payment for which the Supreme Court enforced; the *legal* part of the contract here is the payment into the fund of a royalty on every ton of coal mined by Kaiser itself, payment of which has been made 100% by Kaiser. The *illegal* part of the contract in *Kelly* was the agreement not to deliver onions to the futures market, which the Supreme Court held could not be enforced, but since this illegal part was *not* the part sought to be enforced, its illegality was irrelevant to the enforceability of the legal, already–executed portion on which the suit was brought; the *illegal* part of the contract in the case at bar is the agreement for Kaiser to pay a royalty on coal which it has not mined, *and since this is the very part of the contract sought to be enforced, its illegality cannot be irrelevant. Its illegality makes it unenforceable, just as was the nondelivery agreement in Kelly.*

As Kaiser points out in its brief, if it were to sue the UMWA for damages under the antitrust laws, it would arguably be able to recover any purchase–of–coal penalty payments it made pursuant to the unlawful clause.[32] It would be unseemly for this court to compel Kaiser to make the very payments giving rise to pecuniary injury redressable under the antitrust laws.

Likewise, enforcing the clause would result in the precise conduct section 8(e) is meant to proscribe. The section's prohibition of hot cargo agreements was intended to protect neutral employers like Kaiser from harm caused by being caught in the middle of a dispute between other parties.[33] It is argued that the purpose of the purchase–of–coal clause is to pressure UMWA signatories to boycott non–UMWA producers, thereby giving the union a lever in its attempt to organize the nonsignatories.[34] Assuming this is the case, compelling Kaiser to make the penalty payment results in the principal injury section 8(e) is intended to prevent: harm to neutral parties.[35]

The majority recognizes, without so saying, that the effect of the purchase of coal clause is to penalize (either by eliminating sales or forcing sales at lower prices) the purchase of nonunion coal: "If Kaiser had raised a timely challenge to the purchase–of–coal–clause and won, the union (as guaranteed in the contract) would have had a chance to bargain for a lawful substitute. It might have succeeded in obtaining an increased rate of contribution for coal mined by an employer's own workers to offset what was lost by the invalidation (*ex hypothesi*) of the disputed clause." Majority opinion at 1313. This insight comprehends indubitably the clause's effect, which is to allocate the cost of the benefits received by union employees to nonunion employees and producers. The nonunion parties receive no benefits from this additional cost transferred to them by the operation of the purchase–of–coal provision. It is plain that a penalty is involved where nonunion producers and employees pay a price without realizing any benefits. The nominal assignment to Kaiser of the costs associated with the purchase–of–coal clause does not mitigate the damage to the nonunion parties. The damage, or penalty ef-

**32.** Brief for Appellant at 26–27.

**33.** *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 624–25, 635, 87 S.Ct. 1250, 1254, 1263, 18 L.Ed.2d 357 (1967).

**34.** Brief for Appellant at 4.

**35.** The court states (at footnote 5): "It may well be that the provision Kaiser challenges here is a kind of 'union standards' clause and, hence, lawful under section 8(e)." *But there is no issue in this case of pension benefits "below union standards."* It must be assumed that the price Kaiser pays for coal it buys from non-union producers includes a component attributable to the pension benefits the nonunion producers pay their employees. The clause at issue only prejudices the nonunion producers by making their coal less attractive to Kaiser; and prejudices Kaiser by constraining its opportunity to choose coal suppliers for itself. Though the majority writes "[i]t may well be . . .", there is no evidence that this clause was a "union standards" clause, and such an assumption is unwarranted on this appeal from summary judgment granted below. *See* note 30 *supra.*

fect, results when Kaiser would naturally shift part of the cost to the nonunion parties by decreasing coal purchases from them and increasing purchases from union producers, i. e., even paying somewhat higher prices or purchasing from nonunion producers at sufficiently lower prices.

Enforcement of this illegal claim in the now expired contract will, of course, have future effects. The same clause is present in the current contract.[36] On the basis of this precedent, all the trustees have to do respecting the present contract is wait until it expires and automatically collect on it, too. By enforcing an illegal contract in this suit the court provides a precedent for enforcement in the future of a contract which Congress has outlawed. It is true that Kaiser still has the option of seeking a declaratory judgment as to the 1978 contract or suing the union for treble the amount it is ordered to pay here. But for reasons expressed elsewhere in this opinion,[37] I believe it is unfair to require a party wronged by an illegal clause to sue at a time and place satisfactory to the offending party. And the logical time—perhaps the only time—[38] to determine whether the clause is illegal is when enforcement is sought.

### 2. Nonenforcement Of The Clause Does Not Result In A Windfall For Kaiser

The trustees argue that the purchase–of–coal payments are a form of compensation and, relying on *Kelly*, submit that the clause should be enforced to avoid giving Kaiser something "for nothing."[39] On simple basic economic analysis, withholding enforcement could *not* result in a "windfall" for Kaiser. There is evidence in the record indicating that Mid–Continent, from whom Kaiser purchased virtually all of its requirements for mid–volatile coal, provides wages and benefits equal to or better than those provided by UMWA operators.[40] Mid–Continent makes contributions to a pension plan for its own employees,[41] and presumably *these costs are included in the price at which the coal is offered Kaiser.* Thus, every time Kaiser buys a ton of coal from Mid–Continent, part of the price goes into the pension fund for the Mid–Continent miners. It is no windfall for Kaiser if this court declines to enforce a contract requirement that the steel company *also* contribute to a pension fund for miners who did *not* extract the coal; paying fully once for the miners who did the work should be sufficient. If anything, compelling payment of such an unearned royalty to the fund could be viewed as a windfall for the UMWA fund.

### 3. Availability Of Other Remedies And Kaiser's "Delay" Do Not Vitiate Defense

The trustees argue that Kaiser should be precluded from raising the antitrust defense because other remedies were available to the company.[42] Kaiser questions whether it previously could have brought an antitrust action, since absent enforcement of the claim it arguably suffered no antitrust injury.[43] The trustees suggest that even so, Kaiser could have brought an action for declaratory judgment as did United States Steel.[44] They argue that "[h]aving determined not to challenge the purchase–of–coal clause at the proper time and in the proper fashion, [Kaiser] cannot be heard

---

**36.** National Bituminous Coal Wage Agreement of 1978, Effective 27 March 1978, *reprinted in* J.A. at 487–89.

**37.** *See* text & accompanying notes 42–51 *infra.*

**38.** *See* note 19 *supra.*

**39.** Brief for Appellees at 22–23.

**40.** Affidavit of Robert Delaney at 3–7 (9 Oct. 1978), *reprinted in* J.A. at 329–33; Affidavit of

S. W. Zanolli at 7–8 (18 Oct. 1978), *reprinted in* J.A. at 480–81.

**41.** Affidavit of Robert Delaney at 406 (9 Oct. 1978), *reprinted in* J.A. at 331–32.

**42.** Brief for Appellees at 23.

**43.** Brief for Appellant at 28.

**44.** *United States Steel Corp. v. UMWA et al.*, No. 75–1966 (D.D.C.1977).

now to complain that the Agreement should not be enforced." [45]

The Court in *Kelly* referred to a judicial reluctance to add nonenforcement of contracts to the arsenal of remedies expressly made available by the Sherman Act.[46] Nevertheless, it recognized an interest in avoiding judicial sanction of restraints of trade, and concluded that nonenforcement of contracts would not be precluded "where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act." [47] Since compelling purchase–of–coal payments by Kaiser would result in such conduct, *i.e.*, punishment of Kaiser for not complying with a group boycott, on *Kelly* principles this is a situation where enforcement should be denied.

The trustees further intimate that Kaiser's refraining from challenging the clause until the contract had expired and the miners had completed their portion of the agreement was unfair.[48] The trustees claim that they did not know of Kaiser's refusal to make the payments until near the end of the contract period.[49] They point out that had the clause been struck down during the time the contract was in force, a substitute clause could have been negotiated.[50]

To a large degree, the trustees' "unfairness" argument depends on their alleged ignorance of Kaiser's decision not to make purchase–of–coal payments–a claim which is *not* available to the trustees in this summary judgment proceeding. If the trustees *did* have knowledge of the breach–and this we must now assume–Kaiser's election not to challenge the clause in court would not be unfair, because the trustees could have

moved in the district court or the NLRB to compel the company to make the payments. Kaiser asserts that the trustees were aware of the nonpayment from 1971 on. If so, and we so assume on summary judgment, it was the *trustees* who had the obligation to take earlier legal action, not Kaiser. The district court *did not make a finding that the trustees lacked knowledge of the breach* during the contract period, *nor, significantly, did the trustees even make such a claim* in their Statement of Material Facts as to Which There is no Genuine Dispute accompanying their motion for summary judgment. If such a claim had been made, no doubt Kaiser would have vigorously disputed it, as Kaiser has in its appellate brief, and thus summary judgment by the district court would have been impossible. It is now therefore outside an appellate court's function to find that Kaiser acted unfairly based on the trustees' possible ignorance of the refusal to pay.

The failure of the union or of the trustees to object to or comment upon Kaiser's noncompliance with the purchase–of–coal clause may indicate their suspicion that the illegality projected for the clause in Article XX(d)(1) would in fact materialize if challenged. By waiting until after the expiration of the 1974 Agreement, the union and trustees may have sought to accomplish an end–around the renegotiation provision and its implied recognition that the purchase–of–coal arrangement would not withstand legal inquiry. In any event, Article XX(d)(1) suggests that the parties to the Agreement all had doubts regarding the clause and were aware that its lawfulness was likely to be reviewed.[51] The Court's

---

45. Brief for Appellees at 23.

46. 358 U.S. at 518–19, 79 S.Ct. at 430.

47. *Id.* at 520, 79 S.Ct. at 432.

48. Brief for Appellees at 20.

49. *Id.* at 6.

50. *Id.* at 7.

51. "Equitable considerations," *see* maj. op. at 1311–1313 would not free the trustees to cir-

cumvent the unlawfulness of a provision intended to benefit the trusts which they administer. Kaiser's challenge of the purchase–of–coal clause, which takes the form of an affirmative defense, is a matter to be decided at law, not equity.

A curious point, however, is that the trustee's legal position has been that they had no notice that Kaiser made no reports or payments in accordance with the terms of the purchase–of–coal clause. Surely this failure to be currently informed of matters pertaining to the employee pension fund manifests a problem for the

decision today unfortunately leaves these understandable doubts unresolved.

Furthermore, it was perfectly permissible in this case for Kaiser to wait until the trustees sued before raising the antitrust defense. Arguably wronged by the union's insistence on inclusion of an illegal clause in the labor contract, Kaiser should be under no obligation to accommodate the labor union and trustees by testing the validity of the clause at a time and in a manner satisfactory to the trustees and the UMWA. Kaiser has pursued its remedy (at the time) which became appropriate, given the appellees' instigation of this lawsuit in the forum and moment of their choice.[52]

Requiring parties subject to onerous, illegal clauses to sue immediately in order to retain the illegality defense is not only unfair, but it increases unnecessary litigation. Ofttimes offending parties recognize that certain clauses are illegal and never seek judicial enforcement. Allowing wronged parties to wait and see if enforcement is sought before raising the illegality defense results in better use of judicial resources and relieves the parties of unnecessary expense.

### 4. Other Case Law Does Not Support Enforcement of the Illegal Contract Clause Here

In arguing that illegality is irrelevant here, the trustees place a great deal of reliance on the Third Circuit's decision in *Huge v. Long's Hauling Co.,*[53] particularly Judge Adams' concurring opinion. In that case, in contrast to Kaiser's regular payment on all coal *it* mined, the employer sought to avoid making *any* payment into the UMWA's health and retirement funds, based on the alleged illegality of a clause

prohibiting subcontracting of coal transportation to nonsignatories. Noting that pension fund contributions *"payable for coal already mined"*[54] are a form of compensation for services performed, that courts are reluctant to recognize defenses against employer promises to make such payments, and that other antitrust remedies were available to the company, the court disallowed the antitrust defense.[55] In so holding, the court followed the *Kelly* rule that the possible illegality of one clause in a contract does not prevent enforcement of a *separable, legal* portion of the agreement. Most significantly, *Long's Hauling* did not hold that a court should enforce a clause that *in itself* violates the antitrust laws.

Concurring in *Long's Hauling,* Judge Adams advocated a special rule with respect to union trust funds. He urged that "where the trustees of a union welfare or pension fund sue to compel an employer to make contributions as stipulated in the labor contract between the employer and the union, the employer may not assert *any* defenses that he may arguably have to that contract."[56] In support of this argument, Judge Adams relied on the Supreme Court's decision in *Lewis v. Benedict Coal*[57] and the importance of pension funds. However, neither *Benedict Coal* nor the utility of trust funds warrants adoption of his special, proposed rule.

*Benedict Coal* is not inconsistent with Judge Adams' proposal, but it is inapplicable to the instant appeal. In *Benedict Coal* the Court was faced with an employer's attempt to set off against amounts due the union pension fund damages suffered by the employer from illegal work stoppages and strikes. The Court determined that

---

tees or this court when they rely upon "equitable considerations."

**52.** That Kaiser may have drawn upon other inchoate remedies suggests, perhaps, that some nature of relief should be availing. There is no justified fear, of course, that Kaiser's alleged surfeit of "other" remedies would entail excessive relief from the burden of a contract clause which is maintained to be unlawful.

**53.** 590 F.2d 457 (3d Cir. 1978).

**54.** *Id.* at 459 (emphasis added).

**55.** *Id.* at 459–60.

**56.** *Id.* at 463 (Adams, J., concurring) (original emphasis).

**57.** 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960).

this depended on whether the collective bargaining agreement could be construed to make (1) the union's performance of its promises a condition precedent to payment of royalties to the trustee, or (2) the trustee's right to the royalties subject to counterclaims the employer has against the union. The court found that performance of union promises was not a condition precedent to royalty payment.[58] It also held that a collective bargaining agreement would not be construed to subject the trustee's right to the royalties to offset by employer claims against the union, unless such an intent were expressed in "unequivocal words." Such words were not present in the agreement, and no set off was allowed.[59] Thus *Benedict Coal* presented primarily a question of contract construction; nowhere did the Court suggest that fund trustees may enforce illegal contracts.

I believe that union trust funds serve vital public interests. But I do not think that their importance warrants a wholesale exemption from the rule that courts should not enforce illegal contract clauses. Society has an interest in discouraging unlawful conduct, including that of labor unions as well as business. The *Kelly* standard strikes the best balance between society's interest in sound trust funds and in deterring unlawfulness; and besides, it is the Supreme Court which has struck that balance. Thus if payment into union funds of "penalty" or other contributions itself would violate the law, any law–abiding court must deny such a remedy. Since compelling payment here would violate the law, enforcement cannot be granted.

In addition to *Long's Hauling*, the majority opinion relies heavily on *Waggoner v. R. McGray, Inc.*,[60] wherein a panel of the Ninth Circuit held, over a dissent, that the primary jurisdiction doctrine precludes a federal court from entertaining an unfair labor practice defense. In *Waggoner* trustees of a number of employee benefit funds sued various building contractors and subcontractors for payments due under the terms of a "Master Labor Agreement." This Agreement required signatory employers to make fringe benefit contributions on an hours–worked basis to the trusts established for their employees. Furthermore, contractors were by the terms of the Agreement prohibited from granting contracts to subcontractors who were "delinquent." The contractors were also to become liable for the delinquencies of those subcontractors who had been granted contracts after having been posted on a "delinquency list" prepared and furnished to the contractors by the union. The defendant employers, contractors and subcontractors, were all signatories to the Agreement.

The decision in *Waggoner* rests on outstanding differences in the facts, which distinguish the situation in that case from the case before this court. In *Waggoner* the alleged right to employee benefit contributions operated to benefit union members *who had in fact worked the hours to accrue the benefits.* All of the employees, unions, and employers *who were affected* by this provision of the Agreement *were also parties to the Agreement.* In the case before this court, on the other hand, the union trustees demand that Kaiser be compelled to make contributions in accordance with the hours worked by nonunion employees who were never party to the applicable Agreement and do not benefit from it. *This distinction, of course, explains the antitrust defense raised here by Kaiser whereas no such defense was interposed in* Waggoner. The restraint of trade effect, which for summary judgment purposes we must assume to be present in the case before us today, casts the instant facts and defenses in a substantially different light. This distinction removes our case from the more limited arena of employers and employees bargaining together to reach a collective agreement to govern their own limited relations. Consequently, judicial interference becomes more appropriate.

---

**58.**  *Id.* at 465–66, 80 S.Ct. at 493.

**59.**  *Id.* at 466, 470–71, 80 S.Ct. at 493, 495.

**60.**  607 F.2d 1229 (9th Cir. 1979).

The *Waggoner* court also fails to consider fully the impact of recent Supreme Court cases which limit the primary jurisdiction doctrine. The Ninth Circuit, full of enthusiasm to enforce a stiff primary jurisdiction rule, repeatedly cited *Sears, Roebuck & Co. v. Carpenters*,[61] as authority for its outcome, even though the *Carpenters* decision expands quite considerably the jurisdiction of courts to consider questions which occur in the context of labor disputes. To be sure, *Waggoner* recognized that "later cases have *refined* the *Garmon* [primary jurisdiction] standard." [62]

This "refinement" of the primary jurisdiction doctrine is evinced as well in *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*,[63] but is not relied upon in *Waggoner*. In *Connell* the Supreme Court held "that the federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies, including the antitrust laws." [64] The majority in *Connell* were persuaded that "[t]here is no legislative history in the 1959 Congress suggesting

that labor–law remedies for § 8(e) violations were intended to be exclusive, or that Congress thought allowing antitrust remedies in cases like the present one would be inconsistent with the remedial scheme of the NLRA." [65]

It is odd that *Waggoner* reflects only part way the statutory and precedential authorities which permit district courts to adjudicate suits over collective bargaining agreements which arise under section 301 of the Labor Management Relations Act.[66] Thus, *Waggoner* would require employers to face union claims in district courts [67] without allowing the same forum and opportunity to hear the correlative defenses.[68] This bifurcation seems hardly equitable in view of the Supreme Court's restrictions upon the primary jurisdiction doctrine, as well as usual concern for judicial consolidation in the interest of coherence and efficiency.

The trustees cite several other cases that rely on *Kelly* in arguing that illegality of the clause is irrelevant in this action.[69]

---

**61.** 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978).

**62.** 607 F.2d at 1233 (citing *Carpenters*) (emphasis added).

**63.** 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).

**64.** *Id.* at 626, 95 S.Ct. at 1837 (footnote omitted).

**65.** *Id.* at 634, 95 S.Ct. at 1841 (footnote discussing Justice Stewart's dissent *id.* at 638, 650, 95 S.Ct. at 1842, 1848 omitted).

**66.** 29 U.S.C. § 185 (1976).

**67.** *See* 607 F.2d at 1234–35.

**68.** *See id.* at 1236.

**69.** *See* Reply Brief for Appellant at 11, 12 n.14 (citing following cases): *e. g., Pennington v. United Mine Workers*, 325 F.2d 804 (6th Cir. 1963) (rejecting employer's attempt to avoid welfare fund contribution because union security clause was illegal and the contract was entered under duress), *cert. denied*, 381 U.S. 949, 85 S.Ct. 1796, 14 L.Ed.2d 723 (1965); *Universal Towing Co. v. United Barge Co.*, 579 F.2d 1098, 1103 (8th Cir. 1978) (party to contract tried to avoid obligation to pay rent on ground that contract contained a separate price fixing

agreement); *Arkla Air Conditioning Co. v. Famous Supply Co.*, 551 F.2d 125, 127 (6th Cir. 1977) (manufacturer tried to avoid paying commissions owed to distributor under agreement that included exclusive territorial arrangement, arguing that the exclusive was illegal; the court (i) held that the unlawful provision was collateral to that sought to be enforced and that enforcing the payment obligation would not bring about antitrust injury and (ii) noted that, since the manufacturer was the source of the restrictions, the defense "lies ill in the mouth of the defendant"); *Levin v. IBM*, 319 F.Supp. 51 (S.D.N.Y.1970) (plaintiff sought to prevent foreclosure by lessor for nonpayment of rent on ground that lease agreement also included alleged tie–in provision); *Viacom Int'l Inc. v. Tandem Prod., Inc.*, 526 F.2d at 598 (whether contract clause could be enforced would "depend on the court's perception of the contract [provision sought to be enforced] as a separate or 'collateral' entity or as an integral part of [the illegal provision], enforcement of which would effectuate 'the precise conduct made unlawful' "); *Thomas v. Reading Anthracite Co.*, 264 F.Supp. 339, 344–48 (M.D.Pa.1966) (coal operator defended suit by UMW fund trustees for contributions on ground that funds' management was illegal since "neutral" trustee was union official; the court rejected the defense, not because it was insufficient as a matter of law, but because the defendant operator had ratified the trustee's appointment).

With one exception, all of the cases involved attempts to avoid enforcement of legal clauses on the ground that a collateral, separable portion of the agreement was illegal. The sole exception is *Mullins v. Reitz Coal Co.*,[70] decided by a district court in our circuit after the instant district court decision was issued.

The fact situation in *Reitz* was almost identical to that of this appeal. In rejecting the antitrust defense, the court purported to follow *Long's Hauling* and *Kelly*. It asserted that "enforcement of the defendants' obligations to make contributions can hardly be viewed as" enforcing an antitrust violation.[71] The district court's analysis does not face up to the real issue here. If we assume, as we must, that the purchase-of-coal clause violates the antitrust laws, then enforcement of the clause also violates the law.

On the basis of the above analysis, it is clear that the Supreme Court's rationale in *Kelly* (and progeny) support, rather than negate, the applicability of Kaiser's illegality defense.

B. *The District Court Had Jurisdiction to Determine Whether the Clause Violated Section 8(e)*

The district court rejected Kaiser's proffered defense that the purchase-of-coal clause violated section 8(e), holding that the NLRB had exclusive jurisdiction to make such unfair labor determinations. While I agree that the NLRB generally has exclusive jurisdiction to determine unfair labor practice claims when a plaintiff brings suit for relief, its jurisdiction cannot be exclu-

sive when a plaintiff seeks to have a federal court enforce an unlawful contract provision and the labor law issue is raised by way of defense. *The employer cannot be deprived of his legitimate defense of illegality under the labor laws simply by the PLAINTIFF'S choice of forum; the federal court, in order to do justice, must be authorized to adjudicate the legal issues raised by such defense.*

1. *Courts Have Power to Decide Whether Contract Clauses Violate Law and Public Policy*

The authority of federal courts to enforce contracts is necessarily subject to legal and public policy constraints. As the Supreme Court pointed out in *Hurd v. Hodge*, "[t]he power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in ... federal statutes .... Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power."[72] Section 8(e) is one of those constraints on the authority of the district court to enforce contract clauses. Necessarily then, the district court must have authority to determine the applicability of section 8(e) to the clause it was asked to enforce.

This power and obligation of the courts is particularly clear with respect to section 8(e) because of the section's explicit language.[73]

---

70. No. 78–715 (D.D.C. 23 Mar. 1979).

71. *Id.*, slip op. at 6.

72. 334 U.S. 24, 34–35, 68 S.Ct. 847, 853, 92 L.Ed. 1187 (1948) (footnotes omitted).

73. Footnote 5 of the majority opinion suggests that a union's anticompetitive acts are broadly protected by labor law exemptions to the antitrust law. To be sure, there are statutory and implied labor exemptions for some anticompetitive activity, but the exemptions at most only cover lawful labor practices. *See Consolidated Express, Inc. v. New York Shipping Ass'n, Inc. (Conex)*, 602 F.2d 494 (3d Cir. 1979), *vacated*

*and remanded on other grounds,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980) (violation of section 8(e) "hot cargo" prohibition automatically strips unions and employers of any antitrust exemption). "Where an action seeks only declaratory or injunctive relief, a finding that an agreement violates § 8(e) should always remove the antitrust exemption. Once it is clear that a § 8(e) violation has occurred no labor policy is advanced by permitting on-going operation of an illegal contract ...." *Id.* at 519. Though the NLRB had made a previous determination that the contract clause in *Conex* violated § 8(e), and the court decided to give collateral estoppel effect to the NLRB's deter-

### 2. Clauses Violating Section 8(e) Are "Unenforcible And Void" and Should Not Be Enforced by Federal Courts

Section 8(e) declares that "hot cargo" clauses are not only unfair labor practices, but also "unenforcible and void." [74] It would be difficult to phrase a more clear and unmistakable statutory command that federal courts refrain from enforcing such illegal clauses.

The trustees argue that this language is not meant to create a separate enforcement mechanism independent of proceedings before the NLRB. Rather, they suggest that it was used to describe the status of agreements after the NLRB makes an unfair labor determination.

In making this argument the trustees refer to statements in the legislative history indicating that section 8(e) was intended to create a new unfair labor practice. They argue that the addition of the "unenforcible and void" language by amendment did not change Congress's initial purpose or understanding. That amendment provided that "any contract or agreement entered into heretofore or hereafter containing such an [illegal hot cargo clause] shall be to such

---

mination, id. at 511–12, the implication of that court's collateral estoppel analysis is that it assumed a district court would certainly have jurisdiction to consider the legality of labor practices and whether they violate the antitrust laws.

**74.** 29 U.S.C. § 158(e) (1976).

The majority opinion cites at 1306 *International Union, United Mine Workers of America and Bituminous Coal Operators Association*, 188 N.L.R.B. 753 (26 Feb. 1971) (Supplemental Decision and Order) for the proposition that "hot cargo" clauses are not plainly violative of section 8(e). There, the Board held lawful a clause within a collective bargaining agreement between coal miners and coal operators which required the signatory operators to make certain payments to the union for coal they obtained by subcontracting work out to nonsignatory mines. The Board affirmed the Trial Examiner's findings that "the intent of the parties in adopting the 80–cent clause was to equalize the differences in the costs of wage and fringe benefits generally existing between mines signatory to the National Bituminous Coal Wage Agreement and those which are not in order to protect the work opportunities and standards provided UMW members employed by signatory operators" and "that wage, fringe, and working condition standards of employees in nonsignatory mines are generally lower than those established in the National Bituminous Coal Wage Agreement...." Id. at 753. The Board wrote that: "The validity of a union standards clause lies in the fact that it removes the economic incentive to subcontract unit work to employers maintaining substandard conditions of employment which enable such employers to perform the work at cheaper labor costs. Id. at 754. Here, the factor of "union standards" and the intention to propogate them are completely missing. There have been no findings that the intent of the parties was to protect the wages and working conditions of the union members, or that there was in fact a disparity in the benefits, etc., received by union as compared with nonunion employees. See notes 30 and 35 supra. Moreover, in the cited NLRB precedent, Chairman Miller and member Brown dissented strongly. They stated:

> The lawfulness of the clause does not depend upon the parties' subjective intent in executing the clause or upon their conduct in enforcing it....
>
> We are persuaded that the 80–cent clause is an implied union signatory clause, and not a union standards clause as found by our colleagues. Clearly, as the Mid–Continent example demonstrates, signatories are required to make the 80–cent payment on coal purchases from nonsignatories even though the wage and fringe benefit standards of the nonsignatory may be comparable to or even better than those established in the UMW contract, while no such payment is imposed on coal purchased from signatories.... Accordingly, even though we accept the Trial Examiner's findings that the parties adopted the clause in order to equalize the wage and fringe benefit costs of signatories and nonsignatories, we must find that the parties have failed to embody their purpose in language that operates in a lawful [sic] manner.

Id. at 755 (footnotes omitted).

It is plain, then, that a "hot cargo" clause is lawful only under the most refined of conditions, and then only marginally. As there is no evidence in the instant case that the purchase–of–coal clause was intended by the parties to the Agreement as a means of standardizing wages and working conditions among union and nonunion employees or even that there was in fact a differential in the treatment of those two groups of workers, the clause can only be viewed as imposing a penalty on purchases of coal from nonunion producers. Any other conclusion rests only on speculation which ill becomes this court.

extent unenforcible and void." [75] The entire purpose of this addition, according to the trustees, was to ensure that the hot cargo prohibition would reach all contracts, even those in effect at the time of the legislation.

I agree that certainly that was one of the purposes of the amendment. But I am also convinced that another purpose was to declare that such clauses cannot be enforced by the courts. As Congressman Griffin, the sponsor of the House bill after whom the statute was named, stated, the provision "*not only* makes it an unfair labor practice to enter into a 'hot cargo' agreement, *but also, makes it clear that such contracts are 'void and unenforceable.'* " [76] I believe that Congress meant what it said, and that these clauses are unenforceable by the federal courts.

This interpretation finds support in judicial decisions interpreting section 8(e). In *National Woodwork Manufacturers Association v. NLRB,*[77] the Supreme Court point out that section 8(e) was designed to plug a gap in prior law resulting from an earlier Supreme Court decision in *Local 1976, Brotherhood of Carpenters v. NLRB (Sand Door).*[78] The Court stated that, among others, was the concern that "[t]he *Sand Door* decision was believed ... to create the possibility of damage actions against employers for breaches of 'hot cargo' clauses."[79] It was precisely Congress's intent to preclude such damage actions by making the clauses "unenforcible and void."

In *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,*[80] Justice Stewart in his dissent stated that "the signatory of a purely voluntary agreement that violates § 8(e) is fully protected from

any damage that might result from the illegal 'hot cargo' agreement by *his ability simply to ignore the contract provision that violates § 8(e). ...* Since § 8(e) provides that any prohibited agreement is 'unenforceable and void,' *any union effort to invoke legal processes to compel the neutral employer to comply with this purely voluntary agreement would obviously be unavailing.*" [81] In the case at bar, Kaiser Steel has faithfully followed Mr. Justice Stewart's interpretation, with which the Court's majority did not disagree, but my two colleagues will not let Kaiser ignore the illegal contract provision; on the contrary, they insist on compelling Kaiser as a neutral employer to comply with the illegal agreement.

As shown above, the clear statutory language, legislative history, and subsequent judicial interpretation all indicate that a neutral employer is free to ignore an illegal hot cargo clause and raise the clause's illegality as a defense in any subsequent action brought by the union.

3. *Kaiser Should Be Able to Raise the Section 8(e) Defense as a Collateral Matter*

Even if section 8(e) only operated to make hot cargo clauses unfair labor practices within the jurisdiction of the NLRB, it is clear that the district court would still have authority to rule on the section 8(e) defense as a collateral matter. The Supreme Court pointed out that the federal courts have jurisdiction to consider such questions "in suits brought under independent federal remedies, including the antitrust laws." [82] The trustees argue that this plain language in *Connell* does not autho-

---

**75.** Pub.L.No. 86–257, § 704(b) 73 Stat. 525, 542–45 (1959) (*codified at* 29 U.S.C. § 158(e) (1976)).

**76.** 2 NLRB, Legislative History of Labor–Management Reporting and Disclosure Act of 1959, at 1523 (1959).

**77.** 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

**78.** 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

**79.** 386 U.S. at 634, 87 S.Ct. at 1263 (emphasis added).

**80.** 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).

**81.** *Id.* at 649, 650 n.9, 95 S.Ct. at 1848.

**82.** *Id.* at 626, 95 S.Ct. at 1837 (footnote omitted).

rize consideration of the section 8(e) defense in this case. They point out that the only "collateral" labor law issue the Court was asked to determine in *Connell* was whether Congress intended to sanction certain union conduct by enacting a construction industry proviso to section 8(e). Determining that the conduct was not so sanctioned, the Court found that the union's activity was subject to antitrust laws. The trustees point out that the Court was not asked to determine if the union's conduct constituted an unfair labor practice. They would limit the court's authority to consider collateral labor law issues to interpretation of provisos similar to that interpreted in section 8(e).

But I see no reason why the court's authority should be construed so narrowly. In interpreting the construction industry proviso in *Connell*, the Supreme Court considered congressional intent and interests served by section 8(e),[83] the same sort of issues that would be involved in deciding if the purchase-of-coal clause violates section 8(e). Surely, in pursuing the same analysis, the court has authority to rule on the section 8(e) issues presented here.

There is a difference between claims for relief that rest on alleged labor law violation—in which case courts generally defer to the exclusive jurisdiction of the NLRB—and claims relating to or based on other legal grounds for which there is an *independent jurisdictional basis.* Because Kaiser raises the section 8(e) issue by way of defense, in an action brought *by the union's choice* in the district court, the defense *must* be allowed. Federal courts generally have a duty to resolve all legal issues before them, and this case should be no exception.

**83.** *See id.* at 628–35, 95 S.Ct. at 1837.

**84.** *Alyeska Pipeline Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

**85.** 20 U.S.C. § 185 (1976).

**86.** 29 U.S.C. § 1132 (1976).

## III. AWARD OF ATTORNEY'S FEES

The district court awarded attorney's fees to the trustees without explanation, and without the benefit of briefing or oral argument. Federal courts may not award attorneys fees unless authorized to do so by the governing statute.[84] The trustees brought suit under section 301 of the LMRA[85] and section 502 of the ERISA.[86] In my view, neither of these statutes authorizes the award of attorney's fees in this case. On appeal the trustees apparently concede that attorneys fees are not authorized by the LMRA. They therefore contend that the ERISA gave the district court power to award attorneys fees.

Section 502 of the ERISA provides that a civil action may be brought·

by a . . . fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this title or the terms of the plan.

Section 502(g) of the act in turn authorizes the district court to award attorneys fees "[i]n any action under this title by a . . . fiduciary."

This suit was not brought to challenge a violation of the pension plan, but was brought to enforce a collective bargaining agreement. The trustees, however, argue that the plans were "incorporated into the 1974 agreement" and that Article XX of the agreement was incorporated into the plan. Therefore, they argued that violation of one by Kaiser "would automatically violate the other as well" and that Kaiser's failure to make penalty payments under the purchase-of-coal clause accordingly violated the plans.[87] However, the so-called "incorporation" of Article XX into the plans

**87.** The 1950 and 1974 pension plans provided: "Contributions to the [pension trusts] to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the Wage Agreement." Art. V, ¶ 8, *quoted in* Brief for Appellees at 62. The 1950 and 1974 Benefit Plan stated merely that they were established "[p]ursuant to Article XX of the Wage Agreement." *Id.* Art. I.

consists of a description of the sources of funding and imposes no independent obligation on Kaiser. I agree with Kaiser that "[t]he plans . . . no more incorporate Article XX than the 1974 Agreement incorporates the Consumer Price Index to which it refers." [88]

The trustees also argue that they filed suit to "enforce express provisions of" ERISA. They theorize that because *they were required* by ERISA to bring the action that it was brought to enforce ERISA. This argument is absurd. The trustees have confused an effort to *comply* with ERISA with an action to *enforce* it. It may be that had trustees foregone suit against Kaiser they would have been suable under ERISA. But since it has not been shown that Kaiser violated the terms of ERISA or of the plans, I do not see how this suit can be said to enforce ERISA.

Because this action was not brought to enforce a plan or ERISA, I conclude that the district court erred in awarding the trustees' attorney's fees.

## IV. CONCLUSION

This court does not sit to enforce illegal contract clauses. Since the district court held that illegality was irrelevant, it made no determination whether the clause violated antitrust and labor laws. The judgment of the district court should be reversed and the case remanded for a determination whether the purchase–of–coal clause in fact violates antitrust and labor laws. I therefore dissent from the affirmance of the judgment in favor of the trustees.

Furthermore, even if the judgment in favor of the trustees is to be affirmed, I would reverse the award of attorney's fees because such is unauthorized by applicable statutes.

For these reasons I respectfully dissent.

---

**88.** Reply Brief for Appellant at 24–25.